977 F.2d 369
 23 Fed.R.Serv.3d 1344
 Hanley DAWSON, Jr., an individual, and Hanley Dawson
Cadillac Company, an Illinois corporation,
Plaintiffs-Appellants,
v.
GENERAL MOTORS CORPORATION, a Delaware and Michigan
corporation, Defendant-Appellee.
 No. 91-2347.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 13, 1992.
Decided Oct. 13, 1992.
 
 Malcolm M. Gaynor, Robert D. Nachman, Franklin S. Schwerin, A. Daniel Feldman (argued), Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for plaintiffs-appellants.
 Richard C. Godfrey (argued), Martin T. Tully, Kirkland & Ellis, Chicago, Ill., for defendant-appellee.
 Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Hanley Dawson, Jr. (Dawson) and Hanley Dawson Cadillac Company (HDCC) sued General Motors Corporation (GM) for breach of contract, alleging that GM had promised the dealership certain lease terms and then reneged a year later. The district court dismissed the plaintiffs' complaint for failure to state a claim. Because we conclude that the plaintiffs' allegation of a binding promise is sufficient to survive a motion to dismiss, we reverse.
 
 I.
 
 2
 The facts, as alleged by the plaintiffs, are as follows. From 1971 to 1988, Dawson (through HDCC) operated a Cadillac franchise dealership at 630 North Rush Street in Chicago. Cadillac is a division of GM. GM, the lessee of the Rush Street facility, subleased the facility to HDCC under a sublease agreement due to expire on February 28, 1988--unless GM exercised the first of its four remaining five-year options under the lease.
 
 
 3
 Since 1980, HDCC had sold and serviced Nissan (non-GM) vehicles in addition to Cadillacs at the Rush Street facility. By 1986, Dawson had also become a franchised dealer for Toyota, Mitsubishi, Saab, Subaru, Chrysler and Plymouth vehicles; these non-GM vehicles, however, were sold and serviced at a separate building located at 640 North LaSalle Street.
 
 
 4
 By 1976, Dawson had come up with an idea for increasing revenue and cutting costs. He wanted to separate the sales and service functions of all his franchises, using the prime Rush Street location as a multi-line showroom and moving the service and parts functions to a lower-cost site. Under his plan, the Rush Street facility would be converted to a sales facility for Dawson's six other franchises in addition to Cadillac and Nissan. Dawson communicated his proposal to GM on several occasions from 1976 through 1986.
 
 
 5
 The time for Dawson to act came in 1986. He had acquired a site for a service-and-parts facility on North Avenue at the Chicago River. His option to extend his lease on the LaSalle Street property was exercisable only until October 1, 1986. And he would need to make a major investment of money to renovate the Rush Street facility under his plan. Dawson therefore told GM that he needed an answer--that he could not follow through with his plan unless he had GM's assurance that the Rush Street site would continue to be available to him until the year 2008 at substantially the same base rent as that provided under his existing lease, which was $0.76 per square foot.
 
 
 6
 GM responded with a letter dated September 15, 1986, which stated:
 
 
 7
 In response to your inquiry regarding the sublease ... the current five year sublease option will expire February 29, 1988 and four (4) five year options remain for renewal.... It is ... Cadillac Motor Car Division's plan to exercise the remaining five year options extending through 2011.
 
 
 8
 .... While Cadillac cannot guarantee the annual lease rate will not increase, it is anticipated the percent of increase will be a maximum of three percent for each five year option which is to be exercised. Since our plans indicate the continued need for dealer representation for Cadillac in the foreseeable future, Cadillac is not in a position to insure a stabilized rent factor, hence the possibility of an increase. We trust this information will assist in your final decision regarding the planned major rennovation [sic] of the 630 N. Rush Street facility.
 
 
 9
 On September 25, 1986, Dawson wrote to Cadillac:
 
 
 10
 We are very pleased to know that Cadillac intends to exercise all of the remaining five year options to extend its lease through 2011 on the property at 630 North Rush Street which it sublets to us.
 
 
 11
 As we have advised Cadillac, we are working on designs and layouts of major renovations to modernize these facilities which we could not do unless we had firm assurances from General Motors that it will continue to sublet the property to us throughout the entire remaining period of its available options on the base lease on substantially the same terms as our existing sublease.
 
 
 12
 In reliance upon the assurances of Cadillac that it will continue to sublease the property to us and that our annual lease payment of $185,800 will not increase more than 3% for each of the five year sublease terms, we have authorized our architects to complete their drawings and we have committed to the multimillion dollar expenditures required to implement our plans.
 
 
 13
 Dawson then let his option to renew the LaSalle Street lease expire, instructed a contractor to proceed on the Rush Street renovation and added to his commitment in the North Avenue facility.
 
 
 14
 A year later, on September 17, 1987, Cadillac sent Dawson another letter. This letter announced a "General Motors decision to offer [HDCC] a new five year sublease"--but on different terms. Noting that "GM cannot continue to provide you below market rental rates for the portion of the property you use for selling competitive products," the letter offered to lease space used for Cadillac operations at $2.08 per square foot, and space used for Nissan products at $20.00 per square foot. Further, it forbade Dawson to use any of the Rush Street property for non-GM franchises other than Nissan.
 
 
 15
 Dawson could not afford to remain at the Rush Street location under the new lease terms. He went back to the owner of the LaSalle Street property which he had given up, but only 60 percent of it was available. Nevertheless, Dawson rented the remaining LaSalle Street space (at $15.00 per square foot) and, by 1988, when his Rush Street lease expired, he had moved all his operations to the LaSalle Street and North Avenue locations. Due to the costs of the move, limited space and the inferior location, as well as expenses incurred through the renovation plans, Dawson and HDCC soon went out of business.
 
 
 16
 Dawson and HDCC brought a three-count complaint in Illinois state court. Count I sought damages for breach of contract. Count II alleged a violation of §§ 4(b) and 13 of the Illinois Motor Vehicle Franchise Act, Ill.Rev.Stat. ch. 121 1/2, §§ 754 & 763 (1987). And Count III alleged that GM's refusal to allow Dawson to move his non-GM franchises into the Rush Street facility was an intentional interference with an economic expectancy. GM removed the action to federal court on the basis of diversity of citizenship.
 
 
 17
 The district court granted GM's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The court held that Cadillac's September 15, 1986, letter did not constitute an offer that could form the basis of a binding contract. Since Count II also rested on a breach of contract, it fell along with Count I. As for Count III, the district court reasoned that Dawson had no valid expectancy that GM would permit him to sell non-GM vehicles in the Rush Street facility, and that in any event GM's action was not unjustified.
 
 II.
 
 18
 We review a dismissal under Rule 12(b)(6) de novo, accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in favor of the plaintiff. Yeksigian v. Nappi, 900 F.2d 101, 102 (7th Cir.1990). The plaintiffs' claims must survive dismissal if "relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).
 
 
 19
 The parties agree that the substantive law of Illinois applies to the dispute. The principal issue we face is whether the plaintiffs have adequately alleged an enforceable contract with GM.
 
 
 20
 GM focuses exclusively on the letters exchanged in September 1986, arguing that Cadillac's 1986 letter is unambiguous and cannot be read as a binding offer of any sort. If an alleged written contract is unambiguous, the parties' intent is derived as a matter of law from the alleged contract itself. Quake Construction, Inc. v. American Airlines, Inc., 141 Ill.2d 281, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990). GM's argument finds support in much of the language of the letter: "It is Cadillac Motor Car Division's plan ..."; "it is anticipated the percent of increase will be ..."; "We trust this information will assist in your final decision...." Such language suggests the mere provision of information without a binding promise.
 
 
 21
 The plaintiffs, on the other hand, place heavy emphasis on the parties' long-term course of dealing and discussions leading up to the 1986 letters. These additional communications help the plaintiffs' argument in two ways. First, assuming that the two 1986 letters constitute the entirety of the alleged contract, the external discussions can be used to demonstrate ambiguity, for Illinois cases continue to allow extrinsic evidence for that purpose. See Toys "R" Us, Inc. v. NBD Trust Co., 904 F.2d 1172, 1176 (7th Cir.1990); Federal Deposit Ins. Corp. v. W.R. Grace & Co., 877 F.2d 614, 620-21 (7th Cir.1989) (citing cases), cert. denied, 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). Second, these discussions are urged by the plaintiffs to make up part of the agreement itself.
 
 
 22
 GM argues that the complaint does not allege any course of conduct or background discussions, and that the plaintiffs' brief is thus full of new facts not of record in violation of Federal Rule of Appellate Procedure 28(a)(4) and Circuit Rule 28(d)(2). But we have made clear on more than one occasion that a plaintiff is "free on ... appeal to give us an unsubstantiated version of the events," provided it is consistent with the complaint, to show that the complaint should not have been dismissed. Orthmann v. Apple River Campground, Inc., 757 F.2d 909, 915 (7th Cir.1985); accord Early v. Bankers Life & Cas. Co., 959 F.2d 75, 79 (7th Cir.1992). This rule is necessary to give plaintiffs the benefit of the broad standard for surviving a Rule 12(b)(6) motion as articulated in Hishon, 467 U.S. at 73, 104 S.Ct. at 2232, and Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).* Of course, a plaintiff may not argue on appeal that a contract consisted of Y when the complaint alleged that the contract consisted of X. But Dawson and HDCC are not guilty of that. The background discussions between GM and Dawson are quite adequately alleged in paragraphs 6 through 8 of the complaint--paragraphs that GM seems to ignore. GM's best argument here is that paragraph 9 of the complaint refers to the 1986 letter from Cadillac as the "promise" itself. We do not think, however, that that characterization is inconsistent with the plaintiffs' reliance on the additional discussions as being relevant, even crucial, to the parties' alleged contract. In addition, when GM removed this case to federal court it entered a notice-pleading jurisdiction, and the requirement of pleading facts with specificity disappeared.
 
 
 23
 Placed in the context of the prior dealings and discussions between Dawson and GM, the 1986 letter from Cadillac begins to appear more ambiguous. In particular, Dawson allegedly told GM that he needed its "assurance that the Rush Street site would continue to be available to him until the year 2008 at substantially the same base rent cost as his existing lease." GM's response--that its plan was to exercise the remaining five-year lease options and that the percent of rent increase would be "a maximum of three percent for each five year option"--can conceivably be construed as part of a binding offer. GM also points to language in the letter that allegedly disclaims any intent to be bound--for example: "While Cadillac cannot guarantee the annual lease rate will not increase ..." and "Cadillac is not in a position to insure a stabilized rent factor...." The ellipses are significant here, however, for the sentences go on to give what may be read as an assurance of only a limited increase: "While Cadillac cannot guarantee the annual lease rate will not increase, it is anticipated the percent of increase will be a maximum of three percent for each five year option which is to be exercised "; and "Cadillac is not in a position to insure a stabilized rent factor, hence the possibility of an increase."
 
 
 24
 Whether GM made a genuine offer, then, is not free from ambiguity. "If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a [court] cannot properly determine on a motion to dismiss." Quake Construction, 152 Ill.Dec. at 312, 565 N.E.2d at 994 (citing Interway, Inc. v. Alagna, 85 Ill.App.3d 1094, 41 Ill.Dec. 117, 120-21, 407 N.E.2d 615, 618-19 (1980)).
 
 
 25
 GM next argues that, as a matter of law, the terms of the alleged offer were too vague and uncertain to form a valid contract. GM relies on Academy Chicago Publishers v. Cheever, 144 Ill.2d 24, 161 Ill.Dec. 335, 578 N.E.2d 981 (1991), a case in which the Illinois Supreme Court declined to enforce a preliminary publishing agreement because it "lack[ed] the definite and certain essential terms required for the formation of an enforceable contract." Id. 161 Ill.Dec. at 337, 578 N.E.2d at 983. We believe that Cheever is distinguishable. The basic question is whether a court is able, "under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." Id. (quoting Morey v. Hoffman, 12 Ill.2d 125, 145 N.E.2d 644, 648 (1957)). In Cheever that was a matter of sheer guesswork, because the parties had simply not agreed on the essentials of the deal such as the length and content of the proposed book--in fact, all they had really agreed to was a tentative title (The Uncollected Stories of John Cheever ). In our case, two relatively certain terms can be found in the alleged promise: that GM will exercise the remaining five-year lease options through the year 2008 (although the letter inexplicably refers to the year 2011); and that the rent will not increase more than three percent per five-year term. This case is therefore unlike cases where letters make mere vague expressions of warm wishes for a bright future. E.g., Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1440 (7th Cir.1992); see also Valenti v. Qualex, Inc., 970 F.2d 363, 366 (7th Cir.1992).
 
 
 26
 Other Illinois cases, cited by the plaintiffs, support the potential for contractual liability here. The Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or "incomplete" agreements. See, e.g., Quake Construction, 152 Ill.Dec. at 308, 565 N.E.2d at 990; Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill.2d 234, 156 N.E.2d 513 (1958). See generally E. Allan Farnsworth, Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Colum.L.Rev. 217, 254-55, 262 & n. 191 (1987). The fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise. Thus, certain agreements with open terms, such as that in Borg-Warner, and specific promises made in the course of negotiations, as in Quake Construction, have been held to constitute potentially enforceable contracts. It is particularly noteworthy in this regard that one party's acquiescence in the other's reliance on the preliminary agreement is a factor that supports enforcement. Farnsworth, supra, at 262 & n. 191 (citing Borg-Warner, 156 N.E.2d at 517); Quake Construction, 152 Ill.Dec. at 312, 565 N.E.2d at 994; A/S Apothekernes Laboratorium v. I.M.C. Chem. Group, Inc., 678 F.Supp. 193, 196 (N.D.Ill.1988), aff'd, 873 F.2d 155 (7th Cir.1989). Dawson's September 25 letter made clear that he intended to rely on GM's "assurances"; GM allegedly acquiesced in Dawson's reliance by doing nothing for a year. GM argues that Borg-Warner and Quake Construction are distinguishable because they involve letters of intent. We do not think that that fact clearly distinguishes them from the case before us. The underlying principles and reasoning of the decisions apply here as well.
 
 
 27
 GM also argues that, even if GM did make a valid offer, there was no valid acceptance of the offer by Dawson or HDCC. A purported acceptance that contains different or additional terms is not a valid acceptance, but is treated as a counter-offer. Anand v. Marple, 167 Ill.App.3d 918, 118 Ill.Dec. 826, 828, 522 N.E.2d 281, 283 (1988); Arthur Rubloff & Co. v. Drovers Nat'l Bank of Chicago, 80 Ill.App.3d 867, 36 Ill.Dec. 194, 198, 400 N.E.2d 614, 618 (1980). GM contends that Dawson's September 25, 1986, letter purporting to accept GM's offer speaks of "assurances," while GM's letter made no assurances. This point simply goes to the ambiguity of GM's offer; we cannot say with certainty that Dawson's use of the term "assurances" changed the terms of the alleged deal. GM further argues that Dawson changed several "key terms" on GM: including permission to move seven non-GM franchises into the Rush Street facility; adding Dawson as an individual party to the lease; and including a major building renovation. There are two responses to GM's argument. First, we cannot say with certainty at this point whether these additional "terms" were part of GM's alleged offer, since they may have been included in the discussions leading up to the letters exchanged in September 1986. Second, even if they were not part of any offer made by GM, it is not at all clear that they were terms of Dawson's acceptance. Indeed, Dawson's September 25 letter makes no mention of the seven non-GM franchises or changing the parties to the lease; a fair reading of that letter is that Dawson accepted two and only two specific terms--that GM would "extend its lease through 2011" and that the rent "will not increase more than 3% for each of the five year sublease terms."
 
 
 28
 We conclude that there is sufficient ambiguity in the alleged offer and acceptance to permit the plaintiffs to survive dismissal. And there is a sufficient allegation of a breach of the parties' alleged contract (which GM does not dispute). GM's September 17, 1987, letter set the lease rate at $2.08 per square foot for GM vehicles (a 175-percent increase) and $20.00 per square foot for non-GM vehicles (26 times the old rate).
 
 
 29
 Because we have concluded that Count I survives dismissal, Count II, which rests on the same breach of contract, must also be reinstated.
 
 
 30
 That leaves Count III, the tortious interference claim. That claim alleges that GM intentionally interfered with Dawson's economic expectation that the six non-GM franchises (plus Nissan) would be consolidated at the Rush Street location. The elements of tortious interference with an economic expectancy are: (1) a valid business expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) an intentional and unjustified interference which prevents the realization of the expectancy; and (4) damages. Mannion v. Stallings & Co., 204 Ill.App.3d 179, 149 Ill.Dec. 438, 443, 561 N.E.2d 1134, 1139 (1990). The district court held that Dawson did not have a "valid" expectancy in GM's allowing the move, because the parties had no valid contract. The court also noted that in any event GM's action was not "unjustified," but reflected the legitimate concern of refusing to subsidize the sale of competitors' products by providing them a below-market lease rate.
 
 
 31
 We hesitate about reinstating Count III together with Counts I and II, although Count III is only scantily briefed and the parties appear to have assumed that its prospects turn largely on the disposition of the contract claim. In many cases a party's "interference" is not actionable because it is justified or "privileged." IK Corp. v. One Financial Place Partnership, 200 Ill.App.3d 802, 146 Ill.Dec. 198, 209, 558 N.E.2d 161, 172 appeal denied, 135 Ill.2d 556, 151 Ill.Dec. 383, 564 N.E.2d 838 (Ill.1990). Interference designed to protect one's financial interest is generally privileged, id., as is "fair competition," Prosser and Keeton on the Law of Torts § 130, at 1012-13 (5th ed. 1984). Because Dawson's tortious interference claim directly involves GM's competitors--Chrysler, Mitsubishi, Nissan, Plymouth, Saab, Subaru and Toyota--we suspect that GM's actions may have been privileged and therefore nonactionable. Still, the competition privilege has its limitations (it does not extend, for example, to "illegitimate means," see id. at 1012); and since the parties have not fully briefed these issues and the district court relied primarily on the lack of a breach of contract, we cannot clearly say that no relief can be granted on this claim. We therefore shall reinstate Count III as well.
 
 III.
 
 32
 We conclude that there is sufficient ambiguity in the allegation of an enforceable contract to survive dismissal for failure to state a claim. The judgment of the district court dismissing Counts I, II and III is REVERSED and the cause is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 GM has filed a motion to strike the plaintiffs' brief on the basis of these "new facts" as well as new arguments allegedly not made in the district court. Indeed, GM has gone so far as to reprint the plaintiffs' brief in its entirety, shading and underlining those portions that it asserts are "new." GM's argument concerning new facts, of course, is foreclosed by Orthmann and Early. As for new arguments, GM grossly overstates the matter. Most of the arguments asserted to be new are merely permissible variations on issues that were clearly raised below. For example, the plaintiffs can certainly cite an article on developments in contractual liability even though they did not cite the article in the district court. The one true issue that the plaintiffs appear not to have raised below is the issue of misrepresentation, which we treat as waived. GM's motion to strike the plaintiffs' brief is denied