In re MOUNT CALVARY BAPTIST CHURCH a/k/a Mount Calvary Baptist Church & School, Debtor.

CHURCH MUTUAL INSURANCE COMPANY, Plaintiff,

v.

MOUNT CALVARY BAPTIST CHURCH a/k/a Mount Calvary Baptist Church & School and Seaway National Bank, Defendants.

No. 94 C 673.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 13, 1994.

Alan Gregory, Chicago, IL, for plaintiff.

Edward Hubbard, Edward Hubbard & Associates, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

On September 11, 1989, a fire damaged the building and contents of Mt. Calvary Baptist Church on Chicago's south side. One week later, defendant Mount Calvary Baptist Church ("Mt. Calvary") filed for bankruptcy in United States Bankruptcy Court for the Northern District of Illinois. In November 1989, plaintiff Church Mutual Insurance Company ("Church Mutual") filed suit in the United States District Court for the Northern District of Illinois seeking a declaratory judgment that it was not liable to Mt. Calvary on a Multi–Peril insurance policy first issued in December 1987. The complaint was subsequently referred to the United States Bankruptcy Court pursuant to 28 U.S.C. § 157(a).[1]

A trial was held before United States Bankruptcy Judge David H. Coar on September 14, 15, and 17, 1993. On December 29, 1993, Judge Coar issued Proposed Findings of Fact and Conclusions of Law, holding that the Multi–Peril Policy remained in force as to Mt. Calvary and Seaway National Bank, the holder of a mortgage lien on the church, through the September 11, 1989 fire. 162 B.R. 181. This matter is presently before the court on Church Mutual's Rule 9033 Objections to the Proposed Findings of Fact and Conclusions of Law.[2] For the reasons stated below, the Objections are granted in part and denied in part. This court finds that the disputed Multi–Peril Policy was not in force at the time of the fire. Judgment is entered in favor of plaintiff Church Mutual.

### Findings of Fact [3]

1. On September 11, 1989, a fire damaged the building and contents of Mt. Calvary Baptist Church.

2. On May 11, 1981, Mt. Calvary executed its Installment Note payable to Seaway in the principal sum of $1,200,000.00. To secure the Installment Note, on May 11, 1981, Mt. Calvary conveyed to Seaway a first mortgage lien on the Mt. Calvary Church located at 1257–59 West 111th Street, Chicago, Illinois. The Trust Deed was amended December 31, 1981.

3. On or about December 7, 1987, Church Mutual issued a Multi–Peril contract of insurance, number 061970–02–496353 (the "Policy") to Mt. Calvary, subject to terms, conditions, limitations and exclusions in the Policy. It is under this policy that Mt. Calvary claims coverage for losses incurred as a result of the September 11, 1989 fire.

4. Seaway is named as mortgagee under the Policy.

---

1. Section 157(a) provides:
 Each district court may provide that any or all cases under Title 11 or arising in or related to a case under Title 11 shall be referred to the bankruptcy judges for the district.

2. Under Bankruptcy Rule 9033(b), "[w]ithin 10 days after being served with a copy of the proposed findings of fact and conclusions of law a party may serve and file with the clerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection."

3. After reviewing the entire record, the court adopts all of Judge Coar's findings with one exception. The findings to which objections have been filed are highlighted with an asterisk. These findings will be discussed in the first subsection of the "Discussion" section of this opinion.

5. At various times, Church Mutual issued various other policies to Mt. Calvary, including, but not limited to, the following:

| | | |
|---|---|---|
| a. | Worker's Compensation | 061970–07–500295 |
| b. | Worker's Compensation | 016970–07–557465 |
| c. | Business Automobile | 061970–09–502786 |
| d. | Business Automobile | 016970–09–557466 |
| e. | Commercial Fire | 016970–13–564633 |

6. On July 5, 1989, Church Mutual mailed to Mt. Calvary correspondence and Notices of Cancellation for the Business Automobile policy number 016970–09–557466 and the Worker's Compensation policy number 016970–07–557465. Mt. Calvary received this correspondence before July 12, 1989.

7. On July 10, 1989, Church Mutual mailed to Mt. Calvary correspondence and a Notice of Cancellation for the Multi–Peril Policy number 061970–02–496353. Mt. Calvary received the correspondence and notice of cancellation on July 12, 1989.

8. On July 10, 1989, Church Mutual mailed to Seaway a Notice of Cancellation. Seaway received the notice of cancellation on or before July 24, 1989.

9. The cancellation notices provided for cancellation of the policies on the following dates:

| | | |
|---|---|---|
| a. | Business Automobile | July 17, 1989 |
| b. | Worker's Compensation | July 17, 1989 |
| c. | Multi–Peril | July 22, 1989 |

10. All of the cancellations were for failure to pay premiums timely.

11. Each of the letters which accompanied the notices of cancellation included the amount of premium past due and provided that amount must be received within 10 days from the date of "this notice" or the policy would be cancelled. Each also contained the following language:

"Please send us a BANK MONEY ORDER or CASHIER'S CHECK for $_____, and keep your protection uninterrupted. Uncertified personal checks will *not* be accepted."

12. The letters indicated that the amount of overdue premiums on each policy was as follows:

| | | |
|---|---|---|
| a. | Business Automobile | $147.25 |
| b. | Worker's Compensation | $932.50 |
| c. | Multi–Peril | $292.75 |

13. On or about July 13, 1989, Willie Barron ("Barron") was financial secretary of Mt. Calvary and the duties of this office included the payment of bills.

14. On July 13, 1989, Barron wrote a check to Church Mutual for the total of past due premiums indicated in the July 5 and July 10 correspondence from Church Mutual ($1372.50).

15.* Barron placed the check and copies of the three cancellation notices received in July, 1989 in an envelope and mailed the envelope to Church Mutual on July 13, 1989.

16. The envelope from Mt. Calvary was postmarked July 13, 1989 and received by Church Mutual on or about July 18, 1993. Mt. Calvary's business check in the amount of $1372.50 was deposited to Church Mutual's account on July 18, 1989. This check was not in the form of a money order or cashier's check.

17. For all relevant periods, Sharon Kleinschmidt ("Kleinschmidt") was Billing Accounts Receivable Supervisor for Church Mutual.

18. Kleinschmidt caused the $1372.50 payment from Mt. Calvary to be applied to earned premiums due on canceled or expired (terminated) policies rather than to the overdue premiums referred to in the notices of cancellation and correspondence to Mt. Calvary dated July 5 and July 10, 1989.

19. On July 18, 1989, Kleinschmidt wrote to Mt. Calvary advising it of the applications of the $1372.50 payment.

20.* On July 20, 1989, Barron received Kleinschmidt's letter and called to protest the application of the payment. He was told that there was nothing that could be done to change the outcome.

21.* In late August, 1989, Barron made one or two additional phone calls to Church Mutual protesting the application of the July 13, 1989 payment—all to no avail. Barron

was advised by Kelinschmidt that the Multi–Peril Policy was canceled effective July 22, 1989.

22. Church Mutual had an internal procedure whereby payments received without accompanying direction as to how the payment was to be applied would be applied first to earned premiums on canceled or expired policies and then to earned premiums on policies in effect. This policy was never communicated to insureds unless they asked.

23.* Kleinschmidt testified that she never saw the notices of cancellation which Barron placed in the envelope along with the check. The Court finds Kleinschmidt's testimony in this regard is based upon her deductions from what she did with respect to the $1372.50 payment and is not credible.

24.* Kleinschmidt should have known and had reason to know that Mt. Calvary's check dated July 13, 1989 was tendered to pay the earned premiums on the three policies on which cancellation notices were pending on July 18, 1989.

25. On or about July 18, 1989 (before application of the July 13, 1989 check), Mt. Calvary had earned premiums due on account for canceled or expired policies in an amount greater than $1372.50.

26. On or about July 18, 1989, Church Mutual had the following additional internal policies/procedures which were not communicated to insureds unless they asked specifically:

a. Payments to reinstate policies (after cancellation notices sent) must be in the form of money orders or cashier's checks. There were two exceptions:

1. There was a "first-time" rule which would allow payment by personal or business check after the first cancellation notice (this exception was available one time only).

2. There was also an exception for "special payment arrangements" pursuant to which an insured could pay by personal or business check after a can-cellation notice if the payment was made pursuant to a payment schedule previously agreed to by Church Mutual.

b. There was a 10 day grace period after the 10 day period specified in the reinstatement letter which accompanied the notice of cancellation.

27. For purposes of determining when a payment is made, Church Mutual looks to the date of the postmark on the envelope containing the payment.

28.* Kleinschmidt must have known or at the very least suspected that Mt. Calvary's check dated July 13, 1989 was tendered to pay the earned premiums on the three policies on which cancellation notices were pending on July 18, 1989.

### Standard of Review

In reviewing Proposed Findings of Fact and Law made pursuant to a section 157(c)(1) referral, this court conducts "a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with [Bankruptcy Rule 9033]." Bankruptcy Rule 9033(d). *In re Dillon Constr. Co.*, 922 F.2d 495, 497 (8th Cir.1991).

### Discussion

I. *Objections to the Proposed Findings of Fact*

Church Mutual objects to Findings No. 15, 20, 21, 23, and 24. The court addresses these objections below.

*Finding No. 15, 23, 24,* —Church Mutual objects to the Bankruptcy Court's finding that Barron placed copies of the three cancellation notices in the envelope used to mail the July 13, 1989 check he sent to Church Mutual. (Finding No. 15). Church Mutual also objects to the Bankruptcy Court's related findings that Kleinschmidt saw the notices of cancellation which Barron had placed in the envelope, and that as a result, she should

have known and had reason to know that Mt. Calvary tendered the check to reinstate/continue the three policies with pending cancellation notices.

Having reviewed the trial transcript, this court agrees with Bankruptcy Judge Coar's finding that Barron did in fact mail copies of the three cancellation notices in the same envelope as the July 13, 1989 check. As Church Mutual correctly observed, Kleinschmidt's testimony is suspect because she did not appear to be testifying from any independent recollection of events. She instead based her testimony on deductions from how she had applied the $1,372.50 payment. Though somewhat confused, Barron's testimony appears to be have been based on his actual recollection of the material events, and in this court's opinion is more credible.

The court similarly finds that Kleinschmidt did in fact see these cancellation notices accompanying Mt. Calvary's July 13, 1989 check. Again, the court does not find Kleinschmidt's testimony on this point credible in part because it was not based on any independent recollection of the events. Having reached this conclusion, the court has little difficulty finding that Kleinschmidt should have known and had reason to know that the check was tendered to pay the three policies identified in the attached cancellation notices. Why else would the cancellation notices have been attached?

*Findings No. 20, 21* —Church Mutual objects to Bankruptcy Judge Coar's proposed findings that Barron made two or three telephone calls to Church Mutual protesting the application of the church's check—one on July 20, 1989, and one or two in late August 1989. Having carefully reviewed the relevant portions of the transcript, the court agrees with Judge Coar that Barron telephoned Church Mutual on July 20, 1989 and at least one more time in August 1989.

*Finding No. 28* —Finally, having concluded that Kleinschmidt did in fact see the three cancellation notices sent to Church Mutual along with Mt. Calvary's July 13, 1989

payment, the court also finds that Kleinschmidt must have known, or at the very least, suspected that Mt. Calvary intended the payment to be applied towards the three policies with pending cancellations. With more than eleven years experience at Church Mutual, Kleinschmidt knew that not all of the company's insureds followed Church Mutual's precise instructions on how to pay their premiums. Indeed, as noted above, Church Mutual had instituted various policies designed to deal with just this type of situation. Although Mt. Calvary did not send three separate certified checks or money orders as requested in the cancellation notices/offers of reinstatement, the church did send a check totalling the exact amount owed on all three policies. Under the circumstances, Kleinschmidt must have known or at the very least suspected that Mt. Calvary tendered the check to reinstate/continue the three policies with pending cancellation notices.

II. *Objections to the Proposed Conclusions of Law*

In recommending that this court find that the disputed Multi–Peril insurance policy was in effect through the September 11, 1989 church fire, Bankruptcy Judge Coar first held that the form letters accompanying Church Mutual's cancellation notices constituted offers to reinstate/continue three of Mt. Calvary's policies. (Proposed Findings at 10–11). He next found that Mt. Calvary's tendering of a single personal check instead of the requested three certified checks or money orders constituted a rejection of this offer and a counter offer. (*Id.* at 11–12). Judge Coar interpreted this counter offer as follows:

"Here is my business check in the amount of the premiums due (on the policies referenced in the enclosed notices), tendered to you prior to the effective date of the notice. You may keep this check if you agree to cancel the notice of cancellation and continue the policy in force."

(*Id.* at 12). Finally, Judge Coar found that Church Mutual accepted this counter offer

through its negotiation of the check. (*Id.* at 16–18).

■ Church Mutual raises two general objections to these proposed conclusions of law. Church Mutual first argues that Judge Coar improperly construed Mt. Calvary's non-conforming response as a rejection and counter offer, and should have instead interpreted it as a mere rejection of the offer to reinstate. (Pl. Obj. at 4–6). Noting that under Illinois law, the terms of an offer or acceptance must be reasonably certain or no contract is formed (*see Caporale v. Mar Les, Inc.*, 656 F.2d 242, 245 (7th Cir.1981)), Church Mutual asserts that Mt. Calvary's counter offer was too vague to create a binding contract.

■ This court disagrees. Under Illinois law, an offer cannot be relied on to create a binding contract if it omits essential terms of the agreement such that a court is unable "under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Dawson v. General Motors Corp.*, 977 F.2d 369, 373 (7th Cir.1992) (*quoting Academy Chicago Publishers v. Cheever*, 144 Ill.2d 24, 161 Ill. Dec. 335, 578 N.E.2d 981, 983 (1991)). Here, with the exception of the form of payment, all of the essential terms of Church Mutual's original offer were left standing through Mt. Calvary's non-conforming payment. Church Mutual simply offered to pay in the form of a single personal checks rather than three separate certified checks or money orders. If Church Mutual had accepted the offer, this court would have little difficulty ascertaining what the parties had agreed to do.

Church Mutual also objects to the Bankruptcy Court's conclusion that it accepted Mt. Calvary's counter offer through its negotiation of Church Mutual's check. Church Mutual objects to this conclusion on two grounds. First, Church Mutual argues that it could not have accepted the counteroffer because Kleinschmidt did not know a counteroffer had been made. This argument must fail because this court has found that Kleinschmidt must have known, or at the very least, suspected that Mt. Calvary's tendering of the personal check in conjunction with the three cancellation notices constituted an offer to reinstate/continue the policies in exchange for the check.

■ Church Mutual argues in the alternative that its mere negotiation of the check did not constitute acceptance, and that Kleinschmidt had instead clearly rejected any Mt. Calvary counteroffer in her July 18, 1989 letter to Barron. This second argument is less readily dismissed. Finding that Church Mutual rejected Mt. Calvary's counteroffer to reinstate/continue its Multi–Peril insurance policy, the court enters judgment in favor of plaintiff Church Mutual.

■ Under Illinois law, the intent of the parties controls the question of whether a contract exists. As the Bankruptcy Court properly recognized, when we speak of intent in the context of making contracts, the party's outward manifestation of intention controls, not some secret and unexpressed intention. *Connecticut General Life Ins. Co. v. Chicago Title and Trust Co.*, 714 F.2d 48, 50 (7th Cir.1983). As Judge Learned Hand explained in *Hotchkiss v. National City Bank*, 200 F. 287, 293 (S.D.N.Y.1911), the contracting parties' actual intent is essentially irrelevant.

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party when he used the words intended something else than the usual meaning which the law imposes on them, he would still be held, unless there were mutual mistake or something else of the sort.

Thus, the apparently undisputed fact that Church Mutual intended to reject Mt. Calvary's counteroffer is not dispositive. What matters is how Church Mutual conveyed this intended message to Mt. Calvary.

■ The court's inquiry into the objective intent of the parties is usually framed in

terms of what the other party had reason to know or to believe. *See* E. Allan Farnsworth, *Contracts* § 3.6 (2d ed. 1990). *See also* Restatement of Contracts § 19(2), Conduct as Manifestation of Assent ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents."). In conducting this inquiry, it is essential that the court consider all relevant circumstances surrounding the making of the alleged contract. *Connecticut General,* 714 F.2d at 50 (*citing Borg–Warner Corp. v. Anchor Coupling Co.,* 16 Ill.2d 234, 156 N.E.2d 513, 516 (1958)). After considering all of the relevant circumstances surrounding Church Mutual's response to Mt. Calvary's counteroffer, this court concludes that Mt. Calvary could not have reasonably interpreted Church Mutual's conduct as acceptance of its offer.

In finding that Church Mutual had accepted Mt. Calvary's counteroffer, the Bankruptcy Court correctly attached great significance to the insurance company's negotiation of Mt. Calvary's check. Indeed, absent any clear manifestation of Church Mutual's intention to the contrary, this court would agree that the mere negotiation of the check would have constituted acceptance. Unfortunately for Mt. Calvary, however, Church Mutual took several other steps coincident with its cashing of the check which clearly indicated its intention to reject any Mt. Calvary counteroffer. First, Church Mutual applied the proceeds from the check to Mt. Calvary's other expired policies, not to the requested policies that had yet to be canceled. Second, Kleinschmidt immediately wrote Mt. Calvary explaining how the money was applied. There can be no doubt that Mt. Calvary perceived this communication as a rejection of its offer because Barron immediately telephoned Kleinschmidt to protest upon his receipt of the letter two days later. Third, Kleinschmidt informed Barron on the telephone on July 20, 1989 that Church Mutual did not apply the check to the three policies as requested.

The mere fact that the check might have been negotiated a few minutes before Kleinschmidt wrote the letter has little legal significance. The object of the inquiry here is again to ascertain the effect that Church Mutual's outward manifestation of its intent might have had (or been expected to have had) on Mt. Calvary. Here, Mt. Calvary did not learn about (nor could have been reasonably expected to have learned about) Church Mutual's acceptance of its check until after its receipt of Kleinschmidt's letter. Under these circumstances, the court concludes that Mt. Calvary could not have reasonably interpreted Church Mutual's conduct as acceptance of its offer.

 One question remains. As the Bankruptcy Court noted, case law exists for the proposition that under Illinois law, an insured has the authority to direct its insurer how to apply its payments. (Proposed Findings/Conclusions at 13, 16, *citing Griffin Wellpoint Corp. v. Engelhardt, Inc.,* 92 Ill. App.3d 252, 46 Ill.Dec. 888, 414 N.E.2d 941, 949 (1980); *Village of Winfield v. Reliance Ins. Co.,* 64 Ill.App.2d 253, 212 N.E.2d 10, 12 (1965)). Under this theory, an insurer can either apply the funds as requested or return the check. It cannot properly cash the check and apply it to other delinquent accounts of the insured. (Id.). Yet, this is precisely what Church Mutual did here.

Under these circumstances, Mt. Calvary could argue that by improperly applying negotiating its check, Church Mutual has accepted the benefits of the contract, and should therefore be estopped from denying the contract's enforceability. The argument finds some, albeit superficial, support in Illinois law. Like their counterparts in most other jurisdictions, Illinois courts have long held that under some circumstances, acceptance of the benefits of a contract can constitute acceptance or "ratification" of the contract as a whole. *See Arduini v. Board of Educ.,* 93 Ill.App.3d 925, 49 Ill.Dec. 460, 418 N.E.2d 104, 107 (1981) (*citing Toto v. Durand & Kaspar Co.,* 214 Ill.App. 449 (1919)) (rev'd on other grounds, 92 Ill.2d 197, 65

Ill.Dec. 281, 441 N.E.2d 73 (1982)); *In re Marriage of Sherrick,* 214 Ill.App.3d 92, 157 Ill.Dec. 917, 573 N.E.2d 335, 337–38 (1991). Nevertheless, this general rule does not appear to apply where the acceptance of the benefits coincides with a clear manifestation of the party's intent to reject the offer. *See, e.g., Sementa v. Tylman,* 230 Ill.App.3d 701, 172 Ill.Dec. 327, 595 N.E.2d 688, 692 (Ill.App. 1992) (cashing of check intended to serve as offer does not constitute acceptance of contract where party clearly indicated intention not to be bound).[4] Thus, while Church Mutual's improper negotiation of the check may entitle Mt. Calvary to some form of restitution, it did not constitute acceptance of its offer to reinstate/continue the disputed policies.

### Conclusion

For the foregoing reasons, the court holds that Church Mutual never accepted Mt. Calvary's counteroffer and that the disputed Multi–Peril insurance policy was therefore not in effect at the time of the September 11, 1989 fire. Judgment is entered in favor of Church Mutual and against Mt. Calvary.

4. Indeed, Mt. Calvary concedes that the mere cashing of the check alone does not qualify as acceptance. (Response at 9).