**Cheryl K. McPHAUL, Plaintiff,**

v.

**BOARD OF COMMISSIONERS OF MADISON COUNTY, Defendant.**

**No. IP 97–97 CB/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

July 28, 1997.

Roy D. Rogers, Haskin Lauter Cohen & Larue, Indianapolis, IN, for Plaintiff.

Nelson A. Nettles, Norris Choplin & Schroeder, Indianapolis, IN, for Defendant.

### ENTRY DISCUSSING MOTION TO DISMISS

BARKER, Chief Judge.

#### I. BACKGROUND

Plaintiff, Cheryl K. McPhaul ("McPhaul") is suing Defendant, the Board of Commissioners of Madison County ("the Board"), for unlawfully discriminating against her because of her race and disability, in violation of the Americans With Disabilities Act of

1990, 42 U.S.C. § 12101 *et seq.*, as amended by 42 U.S.C. § 1981a, and the Civil Rights Act of 1870, 42 U.S.C. § 1981.

McPhaul is an African–American woman formerly employed in the Madison County Health Department WIC (women, infants, and children) division, (hereinafter, "WIC") from April 4, 1994 until her discharge on January 22, 1996. A Registered Nurse, McPhaul was originally employed in the Health Department as a nutritionist and was one of two African–American employees in WIC. The other employee allegedly left approximately one year after McPhaul's arrival due to a decrease in her hours. McPhaul contends that WIC did not hire any other African–Americans after this employee's departure.

McPhaul alleges that less than a year after she began working at the Health Department, she was diagnosed with colon cancer. In February 1995, she underwent surgery to treat the cancer, and consequently did not work through most of February and March of that year. McPhaul maintains that when she returned to work, she worked as a nutritionist for another month before WIC transferred her to an intake position.

While working intake, McPhaul allegedly experienced hostile treatment by her co-workers. She maintains that Marsha Shock ("Shock"), a white woman also working in intake, continually used racially derogatory terms in McPhaul's presence, including the word "nigger." Although McPhaul repeatedly complained to the WIC Program Coordinator, Arleen Horine ("Horine"), Ms. Shock's behavior did not abate, and Horine allegedly told McPhaul that she should overlook Shock's comments.

McPhaul also alleges that while she was having problems with Shock, she was experiencing additional physical problems, including extreme fatigue. When she asked Horine for a reduction in hours, Horine refused, explaining that because Shock's hours had already been reduced, she could not accommodate a second, similar request. At this time, McPhaul maintains that she also began to receive adverse personnel evaluations.

When McPhaul's doctors could not successfully pinpoint the cause of her fatigue, she went to the Mayo Clinic in Rochester, Minnesota in January 1996, where she was diagnosed with asthma, bacterial endocarditis, and fybromyalgia. McPhaul contends that when she tried to return to work after her visit, Horine refused to accept the Mayo Clinic's written diagnostic assessment of McPhaul's ailments. To return to work, McPhaul was told that she had to obtain a second statement from the clinic, necessitating a request to Mayo's that a second report be FAXed to WIC.

Shortly thereafter, McPhaul received her third adverse personnel evaluation and was notified that she would be terminated due to unsatisfactory performance. McPhaul alleges that this reason for her termination is purely pretextual.

McPhaul invokes the protection of 42 U.S.C. § 1981 in Count I of her complaint, maintaining the Board of Commissioners unlawfully discriminated against her because of her race. She alleges four instances of disparate treatment based on racial discrimination which she argues are actionable under § 1981:(1) her transfer from a nutritionist position to an intake position; (2) her placement on a 90–day evaluation period; (3) the denial of her request for a reduction in hours; and (4) her final discharge. She also alleges that she was required to work in a racially hostile environment. On this basis, McPhaul seeks an award of compensatory as well as punitive damages.

In Count II, McPhaul alleges that the four, above enumerated actions of disparate treatment were also based on her disabilities, in violation of the Americans With Disabilities Act of 1990 ("ADA"), but does not seek punitive damages under this Count.

## II. LEGAL STANDARDS

When considering a motion to dismiss, the Court examines the sufficiency of the complaint, not the merits of the lawsuit. *Triad Assocs. v. Chicago Hous. Auth.*, 892 F.2d 583 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). Dismissal of a complaint is appropriate only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations in the complaint. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct.

2229, 2232–33, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). We accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992). *See also Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.1996). On a motion to dismiss, the Court limits its inquiry to the pleadings.

### III. ANALYSIS

In its Motion to Dismiss, Defendant first argues that government entities are not subject to liability under 42 U.S.C. § 1981. Citing *Jett v. Dallas Independent School District,* 491 U.S. 701, 735, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989), Defendant argues that the exclusive federal damages remedy against a state actor for violation of § 1981 is available only under § 1983. Defendant contends that because McPhaul brought her race discrimination claim under the wrong statute, her claim must be dismissed. Plaintiff, in turn, maintains that *Jett* has been superseded by the 1991 Civil Rights Act and that federal damages claims now can be brought against state actors under § 1981.

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a).[1] Originally, § 1981 did not create a cause of action that would allow a plaintiff to obtain damages for substantive violations of § 1981 by state actors. *Johnakin v. City of Philadelphia,* No. 95–1588, 1996 WL 18821 at 1 (E.D.Pa., Jan.18, 1996). *See also Jett,* 491 U.S. at 721, 109 S.Ct. at 2715–16. Only § 1983 allowed plaintiffs to secure damages against state actors. Section 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

Section 1983 thus created a cause of action against any person acting under color or state law who was responsible for a deprivation of constitutional rights. *Philippeaux v. North Central Bronx Hosp.,* 871 F.Supp. 640, 652 (S.D.N.Y.1994).

The Supreme Court applied these rules in reaching its decision in *Jett,* where a white male teacher assigned to teach at a predominantly African–American high school brought suit against the school district under § 1981 and § 1983. Justice O'Connor held that a municipality may not be held liable for its employee's § 1981 violations under a *respondeat superior* theory— § 1983 was the express "action at law" provided for the violation of rights guaranteed in § 1981. *Jett,* 491 U.S. at 733, 109 S.Ct. at 2721–22. Subsequently, courts have regularly applied *Jett* for the principle that "... the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the constitution and laws,' provides the exclusive federal damages remedy for the violation of rights guaranteed by § 1981 when the claim is pressed against a state actor." *Maldonado v. Metra,* 743 F.Supp. 563, 566 (N.D.Ill.1990) (citing *Jett,* 491 U.S. at 733–35, 109 S.Ct. at 2722).

However, in 1991, Congress passed the Civil Rights Act which amended § 1981 by adding subsections (b) and (c) to the statute. *See Johnakin,* 1996 WL 18821 at 3.[2] Section 1981(c) specifies that "[t]he rights protected by [§ 1981] are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. § 1981(c). *See also Johnakin,* 1996 WL 18821 at 3. In determining whether § 1981(c) overrules the holding in *Jett,* courts' decisions have varied widely.

Plaintiff cites a number of cases which support her argument that the 1991 Amendments to the Civil Rights Act overruled *Jett,* thus allowing a direct cause of action under § 1981 against state actors. The court in *Gallardo v. Board of County Commissioners,* 857 F.Supp. 783 (D.Kan.1994) reasoned that because Congress borrowed the "under color of State law" language from § 1983, it "pre-

---

**1.** § 1981(a) is the entirety of the statute prior to the 1991 amendments.

**2.** Section (b) of § 1981 is not pertinent to this decision.

sumably intended to borrow also the rules of municipal liability under § 1983". *Gallardo*, 857 F.Supp. at 786. The *Gallardo* court reasoned, "Indeed, Congress made no attempt in the amendment to differentiate municipal liability under § 1981 from § 1983." *Gallardo*, 857 F.Supp. at 786.

Many courts have ruled that by adding subsection (c) to § 1981, Congress was actually making it clear that both section 1983 and section 1981 may be utilized to redress discriminatory state action. *See La Compania Ocho, Inc. v. U.S. Forest Serv.*, 874 F.Supp. 1242, 1250 (D.N.M.1995); *see also Gallardo*, 857 F.Supp. at 786. Several other courts, having issued blanket rulings to the effect that the amendment to § 1981 overruled *Jett*, did so without elaborating on their reasoning. *See Jackson v. City of Chicago*, No. 96 C 3636, 1996 WL 734701 at 8 (N.D.Ill. Dec.18, 1996); *Morris v. Kansas Dept. of Revenue*, 849 F.Supp. 1421, 1426 (D.Kan. 1994); *Arnett v. Davis County Sch. Dist.*, No. 92–C–988W, 1993 WL 434053 at 5 (D.Utah Apr.5, 1993); *Ford v. City of Rockford*, No. 88–C–20323, 1992 WL 309603 (N.D.Ill. Oct.15, 1992); *Robinson v. Town of Colonie*, 878 F.Supp. 387, 405 (N.D.N.Y. 1995).

Defendant cites a line of cases which support its argument that *Jett* was not overruled by § 1981(c) and that therefore Plaintiff's § 1981 claim should be dismissed for failing to state a cause of action. In a footnote, the court in *Dennis v. County of Fairfax*, 55 F.3d 151, 155, n. 1 (4th Cir.1995) held that the portion of *Jett* which specifies the appropriate statute for bringing claims against municipalities was not affected by the 1991 Civil Rights Act, and explains further that the purpose of the addition of subsection (c) was not to overrule *Jett* but to codify the holding of the Supreme Court in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976).[3] *See also Philippeaux*, 871 F.Supp. at 655; *Johnson v. City of Fort Lauderdale, Florida*, 903 F.Supp. 1520, 1523 (S.D.Fla.1995) (where the court refers to the lack of legislative history supporting the theory that Congress intended to overrule *Jett*,

and "declines to find such an intention without clear statutory language to that effect.")

The Seventh Circuit has not yet directly addressed this issue. Thus, it is left to us to determine whether *Jett* was, in fact, overruled or supplanted by § 1981(c). The explanations supplied by the courts which have ruled that the first part of *Jett* no longer applies are largely unsupported by legislative history and in our view apply faulty logic. For example, the court in *Gallardo* bases its ruling on the significance of § 1981(c) language, borrowed from § 1983, to wit, "under color of State law." 42 U.S.C. § 1981(c). *Gallardo*, 857 F.Supp. at 786. However, as explained in *Philippeaux*, "The language that gave rise to municipal liability was not the phrase "under color of state law," which merely provides for the liability of individuals who take action under color of state law." *Philippeaux*, 871 F.Supp. at 655. *See also Jett*, 491 U.S. at 719–21, 109 S.Ct. at 2714–16 (discussing scope of liability based on the language "under color of any law" in Section 2 of the 1866 Act.). Inasmuch as the borrowed phrase does not carry the meaning ascribed to it by the *Gallardo* court, its inclusion in § 1981(c) should not be read to invent a new cause of action under § 1981. Furthermore, when Congress borrows a phrase from another statute, it does not always follow that Congress necessarily intended to borrow the whole meaning of the parent statute.

In truth, § 1981's legislative history more convincingly supports the conclusion that subsection (c) had no effect on *Jett* and that *Jett* did not play any role in prompting Congress to amend § 1981. At no time, for instance, either in the floor debate or in the official summaries preceding the enactment of § 1981(c), was mention made of the *Jett* decision. *Philippeaux*, 871 F.Supp. at 655. The legislative history references subsection (c) only briefly, and then only in connection with *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (*see supra*, n. 3). As the *Philippeaux* court points out, it would be inconsistent for Congress, while

---

**3.** *Runyon* held that § 1981 protects rights from private discrimination as well as from discrimination by state actors. *See Federation of African*

*American Contractors v. City of Oakland,* 96 F.3d 1204, 1212 (9th Cir.1996).

expressly codifying the holding of *Runyon,* to overrule *Jett* only by implication, thereby eroding the "bedrock of municipal liability." *Philippeaux,* 871 F.Supp. at 656, n. 9.

For these reasons, we find that *Jett* was not overruled by the Civil Rights Act of 1991 and accordingly § 1983 remains the sole avenue of relief against state actors for violations of § 1981. Plaintiff, therefore, may not bring her claim in this lawsuit against the Defendant Commissioners under § 1981. Defendant's motion to dismiss is **granted,** and Plaintiff's § 1981 claim in Count I is **dismissed without prejudice.**[4] Plaintiff's ADA claim, as advanced in Count II, is unaffected by this ruling.[5]

---

**4.** Defendant also moved to dismiss Plaintiff's claim for punitive damages under § 1981. Because we have dismissed plaintiff's § 1981 claim, we need not address the question whether punitive damages are available under § 1981. Assuming Plaintiff refashions her § 1981 claim in Count I as a § 1983 claim, a punitive damage claim may be sustainable.

**5.** Defendant also argued in its motion to dismiss that punitive damages are unavailable under the ADA and her claim for such should be dismissed. In her Response to Defendant's motion, Plaintiff has clarified that she is not seeking punitive damages on her ADA claim, so the Court regards this issue as moot.