**Marybeth CREMIN, Plaintiff,**

v.

**MERRILL LYNCH PIERCE FENNER & SMITH, INC., Joseph Gannotti, The New York Stock Exchange and The National Association of Securities Dealers, Defendants.**

No. 96 C 3773.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 21, 1997.

Mary Stowell, Linda Debra Friedman, Leng, Stowell, Friedman & Vernon, Chicago, IL, Michael Rubin, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for Plaintiffs.

James P. DeNardo, Kristin L. Dvorsky, McKenna, Storer, Rowe, White & Farrug, Chicago, IL, for Merrill Lynch Pierce Fenner & Smith, Inc.

David L. Lee, Tomes, Lee & Dvorak, Chicago, IL, Jonathan P. Tomes, Law Offices of Jonathan P. Tomes, Chicago, IL, Russell E. Brooks, Brian Kelly Kiser, Milbank, Tweed, Hadley & McCloy, New York City, New York Stock Exchange.

James Stephen Poor, Robert L. Jackson, III, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Terri L. Reicher, Nat. Assoc. of Securities Dealers, Inc., Washington, DC, for Nat. Assoc. of Securities Dealers.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

Plaintiff Marybeth Cremin sues her employer, Merrill Lynch, and supervisor, Joseph Gannotti, alleging that they subjected her to gender and pregnancy discrimination in violation of Title VII. She anticipates, however, that both defendants will move to send these claims to arbitration based on securities exchange arbitration rules. Heading them off at the pass, Count III of Cremin's complaint adds the New York Stock Exchange and the National Association of Securities Dealers as defendants, and seeks a declaratory judgment that the exchange-mandated arbitration of discrimination claims deprives Cremin of her constitutional due process and statutory rights. All four defendants contest this allegation, and have accordingly moved to dismiss Count III.

### RELEVANT FACTS

#### A. *The Arbitration Agreement*

■ In 1982, Marybeth Cremin was hired by Merrill Lynch as a licensed Financial Consultant. Compl. ¶ 2. To work in this area, Cremin had to register with the NASD and the NYSE [1] so that she could trade on the exchanges. *Id.* ¶ 7. She registered by completing the Uniform Application for Securities Industry Registration (Form U–4),

---

1. The NASD is a private corporation in charge of regulating the over-the-counter securities market. Compl. ¶ 6. A self-regulatory organization ("SRO"), it has the authority to adopt and enforce · standards of conduct for the securities firms that are its members. *Id.* Despite its self-regulating status, the NASD must submit its rules and regulations, including those relating to arbitration, to the Securities and Exchange Commission for approval. *Id.*

The NYSE is a corporation that provides facilities and services to its members for the purchase and sale of securities. *Id.* ¶ 5. Like the NASD, the NYSE is a SRO that polices its members' conduct. *Id.* It also must secure the SEC's approval for all rules and regulations. *Id.*

which contained a clause requiring applicants to submit disputes to arbitration as specified in the NASD and NYSE rules:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm or a customer or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register as indicated in Question 8.

Mot. Defs. Merrill.Lynch and Ganotti to Dismiss, Ex. 1 (Form U–4) at 4.[2] The U–4 incorporates not only the rules of the exchanges with which the applicant registers, but also their prospective amendments:

> "I hereby apply for registration with the organizations indicated in Question 8 and ... I submit myself to the jurisdiction of such ... organizations and hereby certify that I have read, understand and agree to abide by, comply with, and adhere to all the provisions, conditions, and covenants of the.. constitutions, by-laws and rules and regulations of the ... organizations as they are and may be adopted, changed or amended from time to time...."

*Id.* These provisions are on the same page and preceded at the top by directions, in capital letters, that "THE FOLLOWING SHOULD BE READ VERY CAREFULLY BY THE APPLICANT"; a signature line appears at the bottom. *Id.* Using this form, Cremin registered with the NASD on Octo-

ber 20, 1982 and with the NYSE on September 11, 1983. *Id.* Ex. 2 ("Registrations & Exams: Cremin, Marybeth N.").

Both the NYSE and NASD have promulgated sets of arbitration rules that apply to registrants and member[3] firms. The NYSE has two provisions relevant here:

- Article XI, section 1 of the NYSE Constitution states that any controversy between a member and any other person arising out of the business of the member shall be arbitrated according to the NYSE Constitution and any rules the Board may adopt.

- NYSE Rule of Board 347 provides that any controversy between a registered representative and any member arising out of the representative's employment with the member shall be settled by arbitration under the procedure prescribed in the rules.

*Id.* Ex. 3 (N.Y.SE, Constitution and NYSE Operation of Member Organizations). At the time Cremin signed the U–4, the NASD Code of Arbitration did not explicitly address employment disputes. In 1993, however, Part I, section 1 of the Code was amended to cover:

> any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of

---

**2.** The Court draws the facts in this section from two sources. One, of course, is the complaint, whose allegations we are bound to accept as true when deciding a motion to dismiss. *See Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir. 1996). Secondly, we look to Cremin's Form U–4, which the defendants have appended to their motions to dismiss, as a document "referred to in the plaintiff's complaint and [] central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993) (citing *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 739 n. 12 (7th Cir.1986)). Along with the U–4 we must consider the NYSE and NASD arbitration rules, which the U–4 incorporates by reference. *See Wojcik v. Aetna Life Ins. & Annuity Co.,* 901 F.Supp. 1282, 1286 (N.D.Ill.1995) ("The arbitration agreement in this case is not just the Form U–4, but the U–4 plus an extrinsic document, the NASD Code of Arbitration Procedure, incorporated by reference in the Form U–4.").

There is, however, one alleged inconsistency that we must resolve between the complaint and

the U–4. Cremin states in her complaint, upon information and belief, that the Form U–4 she signed did not have an arbitration clause. Compl. ¶ 36. But the copies of the U–4 attached to the defendants' motions and bearing Cremin's signature do contain such a clause. "[W]hen a pleading is directly at odds with a document that is properly before the court, the document controls." *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1248 (7th Cir.1994); *see also Foshee v. Daoust Constr.,* 185 F.2d 23, 25 (7th Cir.1950) (holding that written contract attached as exhibit to complaint prevails over inconsistent allegation); *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir.1974) (holding that complaint's exhibit supersedes contradictory allegations). We therefore reject Cremin's contrary allegation and find that the U–4 she signed in 1982 included an arbitration agreement.

**3.** Merrill Lynch is a member of both the NYSE and NASD.

employment of associated person(s)[4] with any members....

*Id.* Ex. 3 (NASD Code of Arbitration Procedure). The Code further provides that disputes eligible for submission under Part I "shall be arbitrated." *Id.*

## B. *The Discrimination Claims*

While working in the securities industry for Merrill Lynch, Cremin claims she was the victim of discrimination on numerous occasions. Compl. ¶ 8. First, her supervisor, Joseph Gannotti, allegedly made disparaging remarks about her status as a working mother. *Id.* Among other things, Gannotti allegedly criticized the number of children Cremin had, stated he did not think women could combine family and career, hinted that Cremin would do "better" at Merrill Lynch if she divorced her husband, and told Cremin he thought she was too busy having children to develop her customer accounts. *Id.*

Second, Cremin claims that Merrill Lynch took adverse action against her because she was a woman and had children. *Id.* She was allegedly denied the same career opportunities that were offered her male colleagues, and worked under less favorable conditions. *Id.* The company allegedly pressured her to transfer clients to other brokers when she became pregnant and, later, denied her proper maternity leave benefits. *Id.* ¶¶ 8–16. When Cremin returned to work after the birth of her child in May 1995, Gannotti allegedly induced her to surrender all her accounts to predominantly male brokers, then fired her immediately afterward. *Id.* ¶¶ 17–23. Cremin's complaint does not reveal when the discrimination began, but the allegations are clear that it lasted through her child's birth in May 1995 and her subsequent termination that same year.

Cremin filed suit in this Court on June 21, 1996, claiming both employer and securities industry-wide discrimination against women in violation of Title VII. Count III, the subject of the defendants' motions to dismiss,[5] deals only with industry discrimination in the form of mandatory arbitration. Distilled, Count III alleges that the exchange-mandated arbitration of Title VII claims robs females employed in the securities industry of due process and perpetuates sex discrimination. The injury is twofold—plaintiffs are allegedly deprived of both constitutional protections and statutory rights under the 1991 Civil Rights Act. The defendants have two responses: (1) Cremin's constitutional claims fail because they are not the product of state action, and (2) Cremin cannot claim the arbitration rules deny her statutory rights because the United States Supreme Court upheld mandatory arbitration of discrimination claims in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). These arguments form the basis of the defendants' motions to dismiss Count III. After careful consideration, we grant the defendants' motions.[6]

---

**4.** As a registered representative of NASD member Merrill Lynch, Cremin is an "associated person." NASD Code By-laws, Art. 1, ¶ (q); *see Wojcik*, 901 F.Supp. at 1285 n. 4.

**5.** While Merrill Lynch and Gannotti filed a joint motion, the NASD and NYSE each filed separate briefs. The briefs are substantively similar and consistent. Accordingly, for convenience's sake, the Court will refer to the defendants and present their arguments collectively.

**6.** Originally, Merrill Lynch and Gannotti briefed this motion as a motion to dismiss and for an order compelling arbitration, addressing a number of claims in Cremin's complaint. The NASD and NYSE, having been named only in Count III, simply moved to dismiss that Count. Instead of filing a response, Cremin moved to strike the motions to dismiss, contending that Merrill Lynch and Gannotti's motion impermissibly addressed the merits of her case and that the Ex-

changes' motions failed to assume the truth of her allegations. This Court determined that, in the interests of judicial economy, it would be most prudent to focus on Count III, and issued a minute order to that effect on October 11, 1996. In the minute order, the Court requested the parties to brief the state action issue and the effect of the Supreme Court's decision in *Gilmer*. The parties did so, and, accordingly, this opinion is limited to evaluating whether Count III and the stock exchange defendants should remain in the complaint.

While these motions were still pending, Cremin attempted to file an amended complaint converting the suit into a class action. Believing that the class complaint would moot the challenge to mandatory arbitration, the Court struck the complaint with leave to refile any appropriate amended complaint after the opinion was issued. We invited the plaintiff to file a motion to reconsider this ruling along with a supporting

## LEGAL STANDARDS

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989). The court must view all facts alleged in the complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to the plaintiff. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir.1996). Any ambiguities are likewise resolved in the plaintiff's favor. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir.1992). Nevertheless, a motion to dismiss should be granted if the complaint fails to state a claim that entitles the plaintiff to relief. *Corcoran v. Chicago Park Dist.*, 875 F.2d 609, 611 (7th Cir.1989). With these standards in mind, we turn to the sufficiency of Count III.

## ANALYSIS

With Count III as her springboard, Cremin mounts the following attacks on the securities industry's mandatory arbitration scheme: First, compulsory arbitration deprives her the right to a jury trial under the Seventh Amendment and the 1991 Civil Rights Act. Second, arbitration forces Cremin to forgo her right, granted by the Constitution and the 1991 Civil Rights Act, to have an Article III court adjudicate her discrimination claims. Third, the arbitration process is unaccompanied by the procedural protections that the Fifth Amendment guarantees litigants. Fourth, arbitration operates to forfeit the statutorily mandated benefits that Title VII confers, compounding the due process violation. Finally, Cremin argues that requiring her to waive each of these rights is both an unconstitutional condition of employment and a violation of the 1991 Civil Rights Act. Because the majority of Cremin's contentions center on Fifth Amendment due process rights, we address them first.

### A. State Action

 Since 1883, the Supreme Court has hewed to the principle that only governmental actors can violate constitutional due process rights. *See The Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 452–53, 42 L.Ed.2d 477 (1974); *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2784–85, 73 L.Ed.2d 534 (1982); *NCAA v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 461–62, 102 L.Ed.2d 469 (1988). The due process clauses in the Fifth and Fourteenth Amendments afford no relief from purely private conduct, no matter how unfair or reprehensible. *Tarkanian*, 488 U.S. at 190, 109 S.Ct. at 461. Private entities may be held to constitutional standards, however, if their actions are "fairly attributable" to the State. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). In *Blum v. Yaretsky*, the Supreme Court clearly set out what does and what does not satisfy this standard:

> First, ... [t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. The complaining party must also show that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the State itself."

> Second, ... a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiative is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.

> Third, the required nexus may be present if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State."

brief addressing whether the class would have standing to challenge exchange arbitration rules. She did so. After reading their submission, the Court finds no merit in the argument that the class would have standing. We therefore deny the plaintiff's motion to reconsider, but, again, invite her to file an amended complaint consistent with this opinion.

457 U.S. at 1004–05, 102 S.Ct. at 2786 (citations omitted). Cremin offers several theories for attributing the NASD and NYSE's arbitration-related conduct to the government, specifically, to the Securities Exchange Commission.

### 1. *The Registration and Arbitration Requirements*

■ Cremin first argues that state action is present in the NASD and NYSE's registration and arbitration requirements. She points to the SEC's relationship with the exchanges for support. In 1982, when Cremin signed the U–4, the Securities and Exchange Act of 1934 required broker-dealer firms and persons not associated with a firm to register with the SEC, as well as with the exchanges on which they traded. 15 U.S.C. §§ 78o(a)(1), (b)(1), (b)(8) (1981). The SEC in 1982 also allowed each exchange to promulgate registration rules. *Id.* § 78o–3(g)(3)(B). Moreover, at that time, the SEC had the power to review and approve proposed NASD and NYSE registration and arbitration requirements, and compelled the exchanges to comply with their own rules. *Id.* §§ 78f (a)—(b), 78o–3 (a)—(b), 78s(b)—(c), 78s(g)(1). Finally, in 1993, the SEC codified its own regulations prohibiting brokers from trading unless they registered with an exchange. 17 C.F.R. § 240.15b7–1 (May 1, 1993). All this, according to Cremin, warrants a finding that the NASD and NYSE registration and. arbitration requirements can be "fairly attributed" to the SEC.

We find that none of these provisions, alone or combined, adds up to state action. The plain fact is that when Cremin registered, no federal statute or SEC regulation required her to do so, to sign a U–4, or to arbitrate. 15 U.S.C. § 78o–3(g)(3)(B) (1981); *see Association of Investment Brokers v. SEC,* 676 F.2d 857, 861 (D.C.Cir.1982); *Duffield v. Robertson, Stephens & Co.,* No. C–95–109, slip op. at 6, 8 (N.D.Cal. Aug. 6, 1996) ("[T]he state action analysis must focus on 1988, the year in which the plaintiff agreed to the arbitration clause at issue."). In 1982, the SEC Act registration provision applied only to broker-dealer firms and individuals who were not associated with a firm. 15 U.S.C. § 78o(a)(1), (b)(8) (1981); *see In-*vestment Brokers,* 676 F.2d at 859; *Duffield,* slip. op. at 7. Cremin registered, by contrast, as an individual associated with a firm, Merrill Lynch. And although the SEC permitted the exchanges to come up with their own registration and arbitration rules for associated individuals in 1982, the Commission did not require the exchanges to do so. 15 U.S.C. § 78o–3(g)(3)(B); *Investment Brokers,* 676 F.2d at 861. Indeed, the NASD imposed mandatory arbitration long before the SEC received the power to review exchange arbitration rules in 1975; the NYSE compulsory arbitration scheme was firmly in place by 1958. *Duffield,* slip op. at 11; *see Investment Brokers,* 676 F.2d at 860 (exchange arbitration rules promulgated before Form U–4 introduced in 1975). Finally, the fact that the SEC began fashioning registration requirements for associated individuals in 1993 is irrelevant—when Cremin signed the U–4 in 1982, no federal law compelled her to register or arbitrate. *Duffield,* slip op. at 7.

■ In short, a governmental actor's "[m]ere approval of or acquiescence in the initiative" of a private actor does not amount to state action. *Blum,* 457 U.S. at 1004–05, 102 S.Ct. at 2785–86. As of 1982, the SEC could do no more than review or approve the NASD and NYSE's registration and arbitration schemes—schemes whose origins predated SEC scrutiny by several years. Furthermore, simply allowing the exchanges to decide whether to formulate their own rules is not an exercise of SEC "coercive power" or "significant encouragement." *Id.* The NYSE and NASD had complete leeway to decide whether to adopt these rules. The SEC was, at best, indifferent to them.

Cremin cites the Seventh Circuit's decision in *R.J. O'Brien & Assocs. v. Pipkin,* 64 F.3d 257 (7th Cir.1995) to support her position that the NASD and NYSE's registration function is a product of state action. The plaintiff in O'Brien presented a constitutional challenge to arbitration procedures used by the National Futures Association ("NFA"). The NFA is a private corporation registered with the Commodity Futures Trading Commission, an independent federal agency cre-

ated by the Commodity Exchange Act, 7 U.S.C. § 1–25 (1988). *Id.* at 259, 262. While the court ultimately rejected O'Brien's constitutional challenge, it nonetheless found the NFA to be a state actor in requiring individual dealers to register. *Id.* at 262. From its inception, the Commodities Exchange Act established for the CFTC a registration function, which the CFTC in turn delegated to the NFA. *Id.* at 258. Because the NFA acted as the CFTC's agent in compelling individual brokers to register, having gotten its orders straight from the government, the NFA was a state actor for the limited purpose of registration. *Id.* at 262. Cremin reasons that, just as the CFTC delegated its registration function to the NFA, so did the SEC to the NYSE and NASD.

This analogy fails. The Commodities Exchange Act has always required registration. 7 U.S.C. §§ 6f(a), 6k(1). But no federal law mandated registration in the securities industry until 1993, well after Cremin signed the U–4. Instead, the SEC left up to each individual exchange the decision whether to promulgate registration rules. In the NFA's case, registration was a function imposed by congressional legislation and delegated by a government agency. In contrast, the NASD and NYSE have been, up through 1993, the sole impetus for registration requirements in the securities industry. Consequently, we find the O'Brien analysis inapplicable to the

NASD and NYSE, as have other district courts. *See Illyes v. John Nuveen Co.,* 949 F.Supp. 580, 583–84 (N.D.Ill. 1996); Duffield, slip op. at 8–9.[7]

### 2. *The SEC's Plenary Control*

■ Cremin's next argument for finding state action centers on the SEC's alleged "plenary control" over the NASD and NYSE's rulemaking process. She maintains that the SEC "has provided such significant encouragement" to the exchanges in this process that their mandatory arbitration rules must deemed to come from the SEC itself. Pl. Resp. at 9 (citing Blum, 457 U.S. at 1004, 102 S.Ct. at 2785–86). Charged with regulating the securities industry, the SEC requires the exchanges to submit proposed rules, which the agency may then approve, deny, or amend. 15 U.S.C. §§ 78s(b)(1), (b)(3)(A). Using these "vast oversight powers," Cremin claims, the SEC "has played an active role" in developing NASD and NYSE mandatory arbitration rules, creating state action. Pl. Resp. at 8.

This line of argument was rejected long ago in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The Supreme Court held in *Jackson* that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Id.* at 350, 95 S.Ct. at 453. Finding that a

---

7. The other authorities Cremin relies on to establish state action under the registration/arbitration requirement theory are equally unavailing. *Moose Lodge v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), held that a private club's discriminatory policies could not be attributed to the state liquor control board based on the Board's pervasive regulation of private clubs. Cremin, however, seizes on a statement near the end of the opinion that the plaintiff was entitled to injunctive relief against the club "insofar as that regulation requires compliance by Moose Lodge with provisions of its constitution and bylaws containing racially discriminatory provisions." *Id.* at 179, 92 S.Ct. at 1974. Likewise, Cremin argues, SEC regulations forcing the exchanges to obey their own rules command a finding of state action.

This argument lacks merit. First, the Supreme Court used its decision in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) to justify the secondary holding in *Moose Lodge.* *Shelley,* however, "has not been extended beyond the context of race discrimination." *Davis v.*

*Prudential Sec., Inc.,* 59 F.3d 1186, 1191 (11th Cir.1995). If anything, the Supreme Court has since *Shelley and Moose Lodge* taken pains to narrow the concept of state action. *Id.* (citing several Supreme Court decisions finding no state action) Second, O'Brien indicates that the Seventh Circuit would view the SEC's requirement that the exchanges comply with their own rules as merely a method "to bolster the private association's enforcement of its own rules," as distinguished from state action. *O'Brien,* 64 F.3d at 262.

Cremin's citation to *Abood v. Detroit Board of Educ.,* 431 U.S. 209, 226, 97 S.Ct. 1782, 1794–95, 52 L.Ed.2d 261 (1977), and its progeny is even more perplexing, since Abood did not discuss, let alone find, state action. Her reliance on a 1994 NASD document commenting on the 1993 federal law requiring registration is falsely premised on the notion that we look to 1993 law to determine whether there was state action in 1982. Moreover, the NASD's own opinion as to whether its actions are attributable to the state is hardly authoritative.

privately owned utility company did not become a state actor by virtue of extensive state regulatory review and approval, the Court remarked:

> The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into "state action."

*Id.* at 357, 95 S.Ct. at 456–57; *see Gold v. SEC,* 48 F.3d 987, 991 (7th Cir.1995) ("Heavy governmental regulation, by itself, does not make a private organization into a government actor, for that would bring under the Fifth Amendment much of the private sector, ranging from hospitals to railroads.'") (citations omitted).

Under *Jackson,* it is clear that the SEC's role in reviewing exchange rules, and arbitration rules in particular, does not make them the product of state action. First, the SEC has never ordered the NYSE or NASD to devise arbitration rules. In fact, when the exchanges first began using mandatory arbitration, the SEC did not even have the power to review exchange rules. *Investment Brokers,* 676 F.2d at 860. Second, while Cremin correctly observes that the SEC has recently begun to participate actively in crafting industry arbitration rules, the SEC has not encouraged or coerced the exchanges to adopt them.[8] Indeed, as of 1982, "[t]he SEC ... 'had never 'approved or reviewed the compulsory arbitration requirements of the self-regulatory organizations of the securities industry.'" *Investment Brokers,* 676 F.2d at 861 (citations omitted).

State action exists "only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786. The specific conduct at issue here is the system of mandatory arbitration, which, as discussed above, the exchanges established on their own, long before the SEC entered the picture.[9]

### 3. The Public Function Doctrine

Cremin's third theory of state action is that, by administering systems of mandatory arbitration, the NASD and NYSE are assuming a traditionally governmental function—adjudicating discrimination claims. Cremin ties Merrill Lynch in by arguing that its "attempted use of judicial power" to enforce the "government-mandated arbitration clause" transforms the firm into a state actor. Neither argument persuades the Court.

First, courts.have consistently held that private arbitration lacks any element of state action. *Davis v. Prudential Sec., Inc.,* 59 F.3d 1186, 1191 (11th Cir.1995) (finding securities industry arbitration proceeding did not constitute state action because it was the creature of a voluntary contractual agreement); Elmore v. *Chicago & Illinois Midland Ry. Co.,* 782 F.2d 94, 96 (7th Cir.1986) ("[T]he fact that a private arbitrator denies the procedural safeguards that are encompassed by the term 'due process of law' cannot give rise to a constitutional complaint."); *Bahr v. NASD,* 763 F.Supp. 584, 589 (S.D.Fla.1991) (NASD's actions in arbitration process are not state action because they arise from a private agreement); *Austern v. Chicago Bd. Options Exch., Inc.,* 716 F.Supp. 121, 125 (S.D.N.Y.1989) (conduct of exchange arbitration panel was not state action), *aff'd,* 898 F.2d 882 (2d Cir.1990). Nor is a court's confirmation of the arbiters' decision state NYSE's power to make rules for delisting a corporation's stock. The case has nothing to do with the NYSE's arbitration

---

**8.** Moreover, the sources Cremin uses to back her statement that "the SEC has played an active role" in cultivating mandatory arbitration all date 1989 and later. *See* Pl. Resp. at 8. They therefore bear not at all on the question of state action in 1982.

**9.** Cremin cites only one case subjecting exchange rulemaking to due process constraints. *See Intercontinental Indus. v. American Stock Exch.,* 452 F.2d 935, 941 & n. 9 (5th Cir.1971). Intercontinental, however, addressed the SEC's control over the

rules. Because a finding of state action is limited by function, Intercontinental does not advance Cremin's theory of state action in exchange arbitration. action. *Davis,* 59 F.3d at 1191; *see also United States v. American Soc'y of Composers, Authors and Publishers,* 708 F.Supp. 95, 96–97 (S.D.N.Y.1989) (mere court approval of arbitration is not state action).

Second, Merrill Lynch is not using the government to deprive Cremin of her constitutional rights, but rather is simply asking this Court to enforce an agreement to determine these rights in a different forum. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi v. Soler Chrysler–Plymouth, Inc.* 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). That mandatory arbitration provides an alternative to judicial resolution does not transform it into state action. Otherwise, all arbitration would be rendered the act of the government, elevating simple contractual disputes to the status of constitutional claims. The effect would be to divest alternative dispute resolution of its efficacy.

Against the weight of authority holding that administering an arbitration system and compelling arbitration are not state actions, Cremin pits the factually dissimilar *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The *Lugar* plaintiff argued that Edmonson Oil had acted jointly with the state to deprive him of due process by using state law prejudgment attachment procedures to attach his property. The Court found state action, pointing out that the state created the attachment procedures itself, in addition to lending a state official, the sheriff, to aid Edmonson Oil in seizing the property. *Id.* at 940–41, 102 S.Ct. at 2755–56.

Cremin contends that Merrill Lynch is also using a government official, i.e., this Court, to enforce the arbitration rules that will inevitably deprive her of due process. There is, however, no comparison with *Lugar.* First, Edmonson Oil used a state-constructed procedural scheme to attach Lugar's property,

whereas Merrill Lynch is simply following privately created arbitration rules and attempting to vindicate its contractual rights. Second, the only government official involved here is this Court—and we refuse to hold that every time a Court enforces a private arrangement it potentially violates one party's constitutional rights. Most important, though, is the fact that the Lugar Court, wary of converting every use of legal procedure into state action, limited its holding to "the particular context of prejudgment attachment." *Id.* at 939 n. 21, 102 S.Ct. at 2755 n. 21. We see no reason to expand the holding of a case that the Supreme Court saw fit explicitly to limit. Accordingly, the Court finds no state action under the public function doctrine.

### 4. State Action Under Cohen v. Cowles Media Co.

■ Finally, Cremin claims that state action exists in this case under the rationale set forth in *Cohen v. Cowles Media Co.,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). Cremin portrays Cohen as standing for the broad proposition that using the court to enforce a contract on a promissory estoppel theory generates state action. This misconceives not only the nature of the U–4 arbitration clause, but also the Supreme Court's holding.

The *Cohen* plaintiff provided a newspaper with political information, on the condition that he remain anonymous. Although the paper had agreed to keep the plaintiff's identity in confidence, it nevertheless ended up publishing his identity along with the information. The plaintiff sued for breach of contract. His claim reached the Minnesota Supreme Court, which held that the plaintiff could only recover, if at all, on a promissory estoppel theory. *Id.* at 668, 111 S.Ct. at 2517–18. The court then denied recovery on the ground that enforcing the promise of confidentiality would violate the paper's First Amendment rights. *Id.* The United States Supreme Court granted certiorari to "consider the First Amendment implications" of the case. *Id.* at 667, 111 S.Ct. at 2517.

The Court ultimately reached the narrow conclusion that when a state court applies state law doctrine in a way that restricts

First Amendment freedoms, it engages in "state action" under the Fourteenth Amendment. *Id.* at 668, 111 S.Ct. at 2517–18. Promissory estoppel is a "state law doctrine which, in the absence of a contract, creates obligations never explicitly assumed by the parties." *Id.* Because these obligations would be enforced using the state court's official power, a judgment for the plaintiff on this ground would constitute state action. *Id.* Claiming that the U–4 is a contract of adhesion, Cremin contends that enforcing it would similarly impose upon her obligations she "never assumed." The resulting "burden on [Cremin's] constitutional rights" would thus emanate directly from this Court. Pl. Resp. at 12.

What Cremin does not acknowledge is the fact that every court faced with the allegation that the U–4 is a contract of adhesion has rejected it. *Nieminski v. John Nuveen & Co.,* 1997 WL 43241, at *3 (N.D.Ill. Jan.23, 1997) (U–4 does not satisfy Illinois law definition of adhesion contract); *In re Prudential Ins. Co.,* 924 F.Supp. 627, 643 (D.N.J.1996) (U–4 arbitration provision is not a contract of adhesion); *Lockhart v. A.G. Edwards & Sons, Inc.,* 1994 WL 34870, at *2 (D.Kan. Jan.25, 1994) (same); *Rust v. Drexel Firestone,* 352 F.Supp. 715, 718 (S.D.N.Y.1972) (same); *see Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33–34, 111 S.Ct. 1647, 1655–56, 114 L.Ed.2d 26 (1991) ("Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context."); *O'Brien,* 64 F.3d at 261 (National Futures Association registration binding broker to arbitrate is not adhesion contract; choice to become exchange member is sufficient evidence of consent). Cremin cites nothing to contradict this imposing line of authority, and we see no reason to disregard it.

The upshot of holding that the U–4 is not an adhesion contract is that Cremin is the source of her own constitutional burdens. Her signature on the form, not the Court's hypothetical ruling, creates the obligation to arbitrate according to exchange rules. The only issue, which we address later, is whether Cremin's waiver of the right to a judicial

forum was knowing. If her waiver is valid, we will enforce the contract because Cremin will have agreed to arbitrate. If the waiver is flawed, we will find that she did not consent to arbitration. But in no case would we restrict Cremin's constitutional rights by dredging up a state law doctrine to manufacture a compact that never existed.

Since all four of Cremin's state action theories uniformly fail, she cannot use the Fifth Amendment's due process clause to reach the defendants' actions. We therefore grant the defendants' motions to dismiss Cremin's Fifth Amendment claims.

### B. *Article III and Jury Trial Rights*

■ Two constitutional claims remain: Cremin's alleged right, under Article III, to have a court host her discrimination case and, under the Seventh Amendment, to have a jury evaluate it. We hold that neither right risks violation in this case.

■ Cremin contends that Article III guarantees her the right to an in-court adjudication of her Title VII claims. By enforcing the U–4's arbitration clause, she claims, we would abrogate that right. However, rights to an Article III tribunal are waivable. *CFTC v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986) ("[A]s a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver."). Assuming the truth of Cremin's premise about Article III's guarantees, two scenarios are possible. One is that she waived her rights to an Article III court by signing the U–4's arbitration clause, in which case she has voluntarily foregone a judicial forum. *See Illyes,* 949 F.Supp. at 580, 584–85 ("[B]ecause plaintiff has voluntarily consented to arbitration, he has waived any right he may have had to a full trial before an Article III court."). The other is that Cremin did not waive her Article III rights, in which case she would be entitled to a trial in an Article III forum. Either way, Cremin would only be denied her day in court if we found that she waived her rights to proceed here. The determining factor, therefore, is Cremin's action, not the Court's—we cannot violate a right she waived. Accordingly, Cremin faces no threat of an Article III deprivation.

A similar analysis applies to Cremin's jury trial claim. The Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes: "In a non-Article III forum the Seventh Amendment simply does not apply." *Geldermann, Inc. v. CFTC*, 836 F.2d 310, 323 (7th Cir.1987). The question is, therefore, whether Cremin consented to have her case arbitrated. Should we find consent, the Seventh Amendment is irrelevant. If, on the other hand, Cremin did not agree to arbitrate, then she will be permitted to present her case to a jury. The impetus is Cremin's—either she consented to arbitration or she did not. Therefore, she has no Seventh Amendment claim because no one is forcing her to give up a jury trial.

To summarize, Cremin faces no threat that she will be deprived of either the right to an Article III court or to a jury trial. Rather, we will simply ask whether she agreed to arbitrate by knowingly forgoing a judicial forum. If the answer is yes, Cremin can hardly argue that her own valid waiver violates the Constitution. Having now examined all of Cremin's constitutional claims, laid out in Count III, we find them to be without merit. The defendants' motion to dismiss them is granted.

### C. Claims Under the 1991 Civil Rights Act

We next turn to the statutory claims in Count III. Cremin alleges that the U–4's mandatory arbitration clause violates her rights under the 1991 Civil Rights Act, depriving her of such statutorily mandated benefits as the right to a jury trial, to an Article III court, and to have the civil rights laws enforced as written.

### 1. The Gilmer Decision—Discrimination Claims Are Arbitrable

The Supreme Court addressed mandatory arbitration of discrimination claims under the securities industry's Form U–4 in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The Court held that statutory claims are generally arbitrable unless the plaintiff proves that Congress intended to preclude waiver of a judicial forum. *Id.* at 26, 111 S.Ct. at 1652. Congress' intention "will be discoverable in the text of the [statute], its legislative history, or an inherent conflict' between arbitration and the [statute's] underlying purposes." *Id.* Applying this analysis to the statute before it, the Age Discrimination in Employment Act, the Court found no evidence that Congress intended to preclude arbitration of ADEA claims. *Id.* at 35, 111 S.Ct. at 1656–57. Before reaching this conclusion, the Court examined a host of alleged conflicts between the ADEA and mandatory arbitration: that arbitration deprives claimants of the judicial forum guaranteed by the ADEA, that the biased panels are inconsistent with the ADEA's objectives, that limited discovery inhibits proof of discrimination, that procedures are inadequate, and that the absence of written opinions prevents effective judicial review. *Id.* at 27–32, 111 S.Ct. at 1652–55. The Court rejected them all, finding that Gilmer had failed his burden of proof, and sent the ADEA claims to arbitration. *Id.* at 35, 111 S.Ct. at 1656–57.

Our inquiry under *Gilmer* is therefore whether Congress intended to preclude arbitration of claims brought under Title VII, as amended by the 1991 Civil Rights Act. Unfortunately for Cremin, every decision since *Gilmer* has held that Congress erected no statutory barrier to compulsory arbitration of Title VII claims. *See, e.g., Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir.1991) (decision after vacation and remand in light of *Gilmer); Mago v. Shearson Lehman Hutton Inc.*, 956 F.2d 932 (9th Cir. 1992); *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698 (11th Cir.1992); *see also Cole v. Burns Int'l Security Servs.*, 105 F.3d 1465 (D.C Cir. 1997) (enforcing pre-dispute arbitration clause requiring arbitration of Title VII disputes).

The last of these, the D.C. Circuit's just-issued opinion in *Cole v. Burns Int'l Security Services*, deserves special note because it furnishes the latest word on *Gilmer*'s application to Title VII claims. Plaintiff Cole signed, as a condition of his employment as a security guard with defendant Burns, a pre-

dispute arbitration agreement (not in a Form U–4) mandating arbitration of all employment disputes. 105 F.3d 1465, 1469 Under the agreement, only the employer could compel arbitration. *Id.* at 1468 n. 1. Cole later filed a Title VII suit in federal court alleging he was the victim of discrimination and challenging the arbitration agreement's enforceability. He focused specifically on the agreement's alleged requirement that the employees pay the arbitrators' fees even though arbitration was imposed by the employer. In a thorough and well-reasoned opinion, Judge Edwards held that 1) the agreement to arbitrate statutory claims was enforceable; and 2) to preserve its validity, the agreement had to be construed to make the employer solely responsible for the arbitrators' fees. *Id.* at 1468.

The opinion is notable not so much for its holding, but rather for its commentary on *Gilmer* and on mandatory arbitration. The court's decision to enforce the arbitration agreement rested largely on the fact that "the Supreme Court has made clear that, as a general rule, statutory claims are fully subject to binding arbitration, at least outside the context of collective bargaining." *Id.* at 1478. Although *Gilmer* could not be read to permit arbitration agreements to waive just any right—for example, to bring Title VII claims in some forum or to have access to a neutral forum—concerns of that nature and magnitude were absent in both *Gilmer* and the case before the court. *Id.* at

1478. Accordingly, *Cole* had to follow *Gilmer*'s prescription that "an employee who is made to use arbitration as a condition of employment effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Id.* at 1482 (quoting *Gilmer,* 500 U.S. at 28, 111 S.Ct. at 1653 (internal quotations omitted)). The court did not enforce the agreement without reservation, however:

> We are … cognizant of the numerous concerns that have been voiced by arbitrators, legal commentators, and the Equal Employment Opportunity Commission ("EEOC"), and National Labor Relations Board ("NLRB") regarding the potential inequities and inadequacies of arbitration in individual employment cases, as well as their concerns about the competence of arbitrators and the arbitral forum to enforce effectively the myriad of public laws protecting workers and regulating the workplace. Nonetheless, in this case, *we are constrained by Gilmer to find the arbitration agreement enforceable.* We do not read *Gilmer* as mandating the enforcement of all mandatory agreements to arbitrate statutory claims; rather, we read *Gilmer* as requiring the enforcement of arbitration agreements that do not undermine the relevant statutory scheme. The agreement in this case meets this standard.

*Id.* at 1467–1468 (emphasis added) Thus, the *Cole* Court acknowledged that its hands were tied by *Gilmer*.[10]

---

**10.** Ironically, Cremin called this Court's attention to *Cole* by filing it as supplemental authority. She contends that the case is relevant to her claim that the securities industry's mandatory arbitration scheme violates her due process rights by charging claimants "onerous and exorbitant filing fees and forum fees, which have exceeded $80,000 in employment disputes." Pl. Resp. at 17. She cites *Cole* as holding that "*Gilmer* would have been different if there were evidence that securities industry employees were required to pay forum fees in order to gain access to the mandatory arbitration process." Pl. Mot. Leave to File Supp. Auth. ¶ 4. (citing *Cole,* 1997 U.S.App. Lexis 2223, at *5).

Cole held nothing of the sort, and, in fact, operates to defeat Cremin's "exorbitant fee" claim. The holding of *Cole* is that employers may not force an employee to sign a pre-dispute arbitration agreement, under which only the employer can compel arbitration, and also require the employee to pay all or part of the arbitrators'

fees. *Id.* at *5–6 & n. 1. Cole was not a securities industry employee; he was applying to be a security guard. *Id.* at *8. He did not sign a U–4; rather, he signed a contract that gave his employer the sole right to compel arbitration of employment disputes before the American Arbitration Association, and which the court could have interpreted as requiring the employee to pay arbitrators' fees upwards of $700 per day. *Id.*at *8–9, *47–55 & n. 9. To salvage the arbitration agreement, the court held that it had to be read to place the arbitrators' fees on the employer's shoulders. *Id.* at *66–67. So interpreted, the agreement was enforceable. *Id.*

Significantly, the court took pains to distinguish this fee scheme from the stock exchange arbitration context. It observed that in *Gilmer,* fees were not an issue because "under NYSE Rules and NASD Rules, it is standard practice in the securities industry for employers to pay all the arbitrators' fees." *Id.* at *59 (citing Daily Labor Rep. (BNA) No. 93, at A–3 (May 14,

■ As clarified by *Cole, Gilmer* stands for the proposition that courts must enforce arbitration agreements that are consistent with the statutory scheme of the claims they cover. The decisions between *Gilmer* and *Cole* concur with this basic proposition. Where courts have differed, however, is on an issue that neither *Gilmer* nor *Cole* addressed: whether Congress has established in Title VII a prerequisite to mandatory arbitration—the claimant's knowing waiver of the right to press her Title VII claims in court. *Compare Prudential Ins. Co. v. Lai,* 42 F.3d 1299, 1305 (9th Cir.1994) *with Beauchamp v. Great West Life Assurance Co.,* 918 F.Supp. 1091, 1098 (E.D.Mich.1996). The Seventh Circuit has not yet dealt with this issue.

### 2. *The Ninth Circuit's Formulation in Lai—A Knowing Agreement*

The Ninth Circuit in *Lai* held that "a Title VII plaintiff may only be forced to forgo her statutory remedies and arbitrate her claims if she has knowingly agreed to submit such disputes to arbitration." 42 F.3d at 1305. The *Lai* plaintiffs were securities industry employees who registered with the NASD, but not with the NYSE, by signing Forms U–4. They alleged they were told they were signing something entirely different and never given an opportunity to read the forms or the NASD manual on arbitration. The U–4s contained the same generic arbitration clause that Cremin signed, but the suit was filed long before the NASD promulgated rules specifically requiring arbitration of employment disputes. The plaintiffs thus contended

1996)). Morcover, "[e]mployees may be required to pay a filing fee, expenses, or an administrative fee, but these expenses are routinely waived in the event of financial hardship." *Id.* The court concluded:

Thus, in *Gilmer,* the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator assigned to hear their statutory claims. There is no reason to think that the Court would have approved arbitration in the absence of this arrangement.

*Id.* at 59–60. *Cole* essentially refutes Cremin's claim that the NYSE and NASD arbitration system forces her to pay excessive fees. Even if the fees were "onerous and exorbitant," they would not render the U–4 arbitration agreement void; instead, the court would interpret the agreement as making fees the responsibility of the employer.

that, even assuming they had agreed to arbitrate, nothing in the U–4 or the NASD arbitration rules mentioned employment disputes. Consequently, their signatures could not have possibly manifested consent to submit Title VII claims to arbitration.

The court agreed. While *Gilmer* and its progeny held that individuals may contract to arbitrate employment disputes, Congress mandated that this agreement be "knowing." *Id.* at 1304. The court gleaned Congress' intent from the legislative history to Title VII's post-*Gilmer* amendment, section 118 of the 1991 Civil Rights Act. Section 118 states that "[w]here appropriate and to the extent authorized by law, the use of alternative dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." Civil Rights Act of 1991, Pub.L. No. 102–166, § 118 (set forth in the historical and statutory notes following 42 U.S.C. § 1981 (1994)). In attempt to clarify the "where appropriate" language, the court cited one House Report explaining:

The committee emphasizes ... that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII.

Plaintiff's own evidence also thoroughly undermines her claim. Of the thirty-plus copies of arbitration awards that Cremin attached to her response brief, only two assessed forum fees against the claimant. *See* Pl. Resp. Ex. I. The amounts were $12,000 and $4800. In both cases, the arbitrators had dismissed the claims in all respects, and given no award to the claimant. This belies Cremin's assertion that exchange arbitrators routinely assess claimants fees that "exceeded $80,000," "even [against] those who prevail." Pl. Resp. at 17; Compl. ¶ 27(i). Contrary to this claim, the highest forum fee assessed in plaintiff's exhibit was $42,900, against the respondent-employer.

Given our reading of *Cole,* we commend plaintiff for bringing this case to the Court's attention.

H.R.Rep. No. 40(I) 102nd Cong., 1st Sess., *reprinted in* 1991 U.S.C.C.A.N. 549, 635. The court also considered Senator Dole's declaration in the Congressional Record that § 118 encourages arbitration only "where the parties knowingly and voluntarily elect to use these methods." 137 Cong. Rec. § 15472, § 15478 (daily ed. Oct. 20, 1991). Combining the "where appropriate" language and the House Report with Senator Dole's "knowing and voluntary" proclamation, the court determined that Congress requires a knowing agreement to arbitrate Title VII claims. *Id.* at 1305. The court observed that no language in the U–4 arbitration clause or the NASD arbitration rules mentioned discrimination claims. *Id.* Indeed, the Seventh Circuit had held as a matter of law that "the NASD provision relevant to this appeal did not cover employment disputes." *Id.* at 1305 (citing *Farrand v. Lutheran Brotherhood*, 993 F.2d 1253 (7th Cir.1993)). Therefore, the plaintiffs could not have been put on notice that they were bound to arbitrate Title VII claims, or entered a knowing agreement to do so. *Id.*

Citing *Lai, Farrand* and section 118 of the 1991 Civil Rights Act, Cremin urges this Court to use the "knowing" analysis to find that she did not waive her rights to proceed in court. *Lai* and its study of legislative history, however, do not aid Cremin, for two reasons. First, *Lai*'s approach is inconsistent with the Supreme Court's *Gilmer* decision, as several district courts have recognized. With *Lai* as the only federal appellate case on point, and no ruling from the Seventh Circuit, this Court must seriously consider *Lai*'s lower-court opposition. Second, and most important, both *Lai* and *Farrand* are factually and legally distinguishable from this case. Both were interpreting NASD arbitration rules before they were amended explicitly to cover employment disputes, and none of the plaintiffs in those cases were members of the NYSE, which has long had an employment dispute arbitration rule. Therefore, applying a "knowing" standard to Cremin produces a result different from these decisions.

### 3. *Lai Is Inconsistent with Gilmer*

The prevailing view is that *Lai* is incompatible with the Supreme Court's decision in *Gilmer*, ignores core principles of contract law, and inappropriately used legislative history to contradict plain statutory language. This view is most forcefully articulated in *Beauchamp v. Great West Life Assurance Co.*, 918 F.Supp. 1091 (E.D.Mich.1996). The court began by criticizing the Ninth Circuit's use of legislative history, calling it a

> slender reed[ ] upon which to rest the weighty and novel conclusion that an arbitration clause is only binding when the claimant has actual knowledge that his particular employment claims will be covered by the agreement.

*Id.* at 1096. The House Report *Lai* accorded so much authority was actually based on a Supreme Court decision, *Alexander v. Gardner–Denver*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), that was distinguished in *Gilmer. Id.* Alexander held that agreeing to arbitrate a contract claim brought under an antidiscrimination clause in a collective bargaining agreement does not preclude a later Title VII suit. *Alexander*, 415 U.S. at 49–50, 94 S.Ct. at 1020–21. *Gilmer* explained that this proposition has no application to agreements, such as the Form U–4, which require arbitration of statutory claims. *Gilmer*, 500 U.S. at 35, 111 S.Ct. at 1656–57. Moreover, outside the collective bargaining context, there was no danger that the employee's interest would be subordinated to the Union's. *Id.* Consequently, the *Beauchamp* court concluded, the House Report was the product of a decision that had nothing to do with the facts in Lai, and reliance upon it was flawed. *Beauchamp*, 918 F.Supp. at 1096–97. Indeed, the House Report flouted § 118's express language favoring arbitration. *Id.* at 1097 n. 4 (citing 42 U.S.C. § 1981 (1994) ("[A]rbitration is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title.")). Next, the court observed, Lai's bald conclusion that Congress prefers jury trials over arbitration ignored *Gilmer*'s statement that "generalized attacks on arbitration" are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Id.* at 1097 (quoting *Gilmer*, 500 U.S. at 30, 111 S.Ct. at 1654). Finally, the court pointed out

the contradiction between *Lai*'s holding that signing an arbitration agreement does not equate to knowledge of its scope, and contract law's rule that one is presumed to know the contents a signed agreement. *Id.* at 1097–98.

Other district courts echo *Beauchamp*'s view of Lai, or attack the authority on which it rests. For example, *Hall v. Metlife Resources*, 1995 WL 258061 (S.D.N.Y. May 3, 1995), criticized *Lai*'s holding that an agreement to arbitrate statutory discrimination claims forces a waiver of substantive statutory rights. *Id.* at *4. This was contrary to *Gilmer*'s holding that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute." *Id.* (citing *Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652) (internal quotations omitted). In addition, the court in *Lockhart v. A.G. Edwards & Sons, Inc.*, 1994 WL 34870, at *4 (D.Kan.1994), was "unpersuaded that [a] paragraph from a committee report is sufficient to establish Congressional intent to preclude a waiver of a judicial remedy in Title VII cases." *Maye v. Smith Barney Inc.*, 897 F.Supp. 100, 109 (S.D.N.Y.1995), likewise remarked that the "two statements" of legislative history cited in Lai "are insufficient to contradict the seemingly unambiguous Congressional endorsement of arbitration in § 118 of the Civil Rights Act."

The interpretation of § 118 as expressly approving and encouraging arbitration prevails in this Circuit as well. *See Nieminski v. John Nuveen & Co.*, 1997 WL 43241, at *7 (N.D.Ill. Jan. 23, 1997) ("The Seventh Circuit has concluded that the effect of Section 118 is to encourage the use of arbitration to resolve federal employment claims.") (citing *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 n. 4 (7th Cir.1995)); *Williams v. Katten, Muchin & Zavis*, 837 F.Supp. 1430, 1436 (N.D.Ill.1993) (section 118 reinforces the strong policy favoring arbitration as a method of enforcing Title VII rights).

Regardless of any personal views this Court may have regarding *Gilmer*, we are obligated, as a district court, to give it full force. Although this Court is sympathetic to the *Lai* approach, we find that the substantial authority refusing to follow *Lai* is more in keeping with the principles *Gilmer* espoused. We are also mindful of the D.C. Circuit's careful adherence in *Cole v. Burns Int'l Security Services* to *Gilmer*, despite some reservations about the decision's effects.

#### 4. *Cremin Knowingly Agreed to Arbitrate*

▮ Moreover, even if we were to follow *Lai*'s "knowing" waiver analysis, it would not save Cremin's remaining claims from defeat. That is because, unlike the plaintiffs in *Lai*, Cremin is governed by the NYSE and recent NASD arbitration rules explicitly covering employment disputes.

In *Wojcik v. Aetna Life Ins. & Annuity Co.*, 901 F.Supp. 1282, 1288–89 (N.D.Ill.1995), this Court held that the NASD Code of Arbitration Procedure's October 1, 1993 amendments, which altered the rules to require arbitration of employment disputes, apply to any suit filed after the amendments' effective date. The plaintiff in *Wojcik* had registered with the NASD using a Form U–4 that, like Cremin's, contained a "compliance clause" binding him to any future amendments to exchange rules. *Id.* at 1285. Pointing out that the Seventh Circuit had expressly recognized the U–4 compliance clause as valid, we determined that enforcing the 1993 amendments was not a prohibited retroactive application of the law. *Id.* at 1288–89 (citing *Kresock v. Bankers Trust Co.*, 21 F.3d 176, 179 (7th Cir.1994)). Rather, we simply followed the well-settled contract rule that "a document should be read to give effect to all of its provisions and to render them consistent with each other." *Id.* at 1290 (citing Illinois contract cases). The two Seventh Circuit decisions, *Kresock* and *Farrand v. Lutheran Brotherhood*, 993 F.2d 1253 (7th Cir.1993), which refused to apply the 1993 amendments "retroactively" and allowed the plaintiffs to proceed in court, were distinguishable because those suits were filed before the amendments took effect. *Id.* at 1287, 1289 n. 13.

Cremin relies on both *Kresock* and *Farrand* in arguing that her signature on the U–4 does not prevent her from challenging its arbitration clause. If it were otherwise, she claims, these two decisions "would have dispatched the plaintiffs who had signed manda-

**1476**

tory arbitration agreements to arbitration, rather than analyzing the facts and law and holding that their claims could be heard in the District Court." Pl. Resp. at 22. Her focus on these cases is misguided.

In *Kresock*, the plaintiff not only signed a U–4 before the 1993 NASD arbitration amendments took effect, but also sued before the amendments' effective date, and complained of conduct occurring before the effective date. *Kresock*, 21 F.3d at 179. The court held that the 1993 amendments did not apply because the "relevant conduct" had taken, place long before they were enacted. *Id.* at 177. "Relevant conduct," as defined in *Wojcik*, means either the discrimination giving rise to the suit, or filing the suit. *Wojcik*, 901 F.Supp. at 1288–89 (holding that U–4's clause requiring compliance with future amendments would have no meaning if "relevant conduct" meant U–4 signing). Thus, the only reason Kresock was permitted to proceed in court was that he filed suit before the NASD Arbitration Code was amended to cover employment disputes. Before 1993, the Seventh Circuit held, the Code could not have been interpreted to include them. *Id.* at 178 (citing *Farrand*, 993 F.2d at 1255). Likewise, the plaintiff NASD registrant in *Farrand* filed his discrimination suit before the 1993 Code amendments. Indeed, *Farrand* was *decided* months before the amendments went into effect, so permitting the plaintiff to sue in court was premised on the fact that the pre-October 1993 Code did not incorporate employment disputes. *Farrand*, 993 F.2d at 1255.

Cremin, like the *Kresock* and *Farrand* plaintiffs, signed a U–4 containing a broad compliance clause that required her to abide by all present and future exchange rules. But this case differs from *Kresock* and *Farrand* in two material respects: 1) Cremin sued and complained of conduct occurring after the NASD's October 1993 amendments; and 2) she is a member of the NYSE, which has long had an arbitration rule covering employment disputes. First, in contrast to both the *Kresock* and *Farrand* plaintiffs, Cremin filed suit in 1996, well past the effective date of the 1993 amendments changing the NASD Code of Arbitration Procedure to include employment disputes. In addition, the discriminatory conduct upon which Cremin bases her Title VII claims occurred up through 1995: she allegedly experienced pregnancy discrimination and was denied maternity leave benefits in conjunction with the birth of her child in May 1995; after Cremin returned to work, she was allegedly forced to turn over all her accounts to male brokers, and was terminated shortly afterward. Therefore, the "relevant conduct" in Cremin's case occurred after the 1993 amendments requiring arbitration of employment disputes took effect. Under *Kresock*, *Wojcik*, and the U–4's compliance clause, she is bound to them. Second, in contrast to the plaintiffs in *Farrand* and *Kresock*, Cremin is a member of the NYSE. By the time Cremin signed the U–4 and registered with the NYSE in 1983, it had promulgated a rule providing specifically for arbitration of employment disputes. *See* Mot. Defs. Merrill Lynch and Ganotti to Dismiss, Ex. 3. Therefore, even if we discounted the U–4's compliance clause binding Cremin to future exchange rules, she would still be subject to the this NYSE rule, which has been in effect ever since she signed the form.

Just recently, a Northern District of Illinois court was faced with a situation almost identical to the one before us. *See Nieminski v. John Nuveen & Co.*, 1997 WL 43241 (N.D.Ill. Jan.23, 1997). Nieminski, a NASD registrant, had executed a Form U–4 with a compliance clause in 1987. *Id.* at *1. On April 4, 1996, she filed a Title VII suit based on discrimination occurring, in part, after October 1993. *Id.* Because Nieminski executed the form years before the NASD Arbitration Code was amended to require arbitration of employment disputes, she contended that, under *Lai*, she could not have knowingly agreed to arbitrate such disputes. *Id.* at *4.

The court rejected this argument. By virtue of signing the U–4 and its compliance clause, Nieminski had agreed to abide by all NASD rules, now and in the future. *Id.* at *5. By the time Nieminski was fired, the NASD Arbitration Code had been amended to cover any dispute arising out of her employment. *Id.* Citing *Wojcik*, the court held:

[W]hen at least some of the allegedly discriminatory conduct took place after the date of the amendments and when suit has been filed after the date of the amendments, the amendments to the NASD arbitration Code apply and arbitration of employment disputes can be compelled.

*Id.* Therefore, by virtue of the compliance clause and the timing of her suit, Nieminski had knowingly agreed to arbitrate her Title VII claims. *Id.* at *4–5. The court distinguished *Lai, Farrand* and *Kresock* because each case was filed "prior to the date of the amendments and involved facts occurring entirely before that date." *Id.* at *5.

The court also grounded its decision in Illinois contract law. Nieminski's signature on the U–4 meant that she had agreed to follow all present and future NASD rules. Even if she was unaware of the full scope of those rules, she could not complain that the agreement to abide by them was not "knowing." *Id.* at *4. Under Illinois law, "[a] party may not avoid a contract fairly entered into because of a mistaken opinion of its legal effect." *Id.* (citing *Bruner v. Illinois Central R.R. Co.,* 219 Ill.App.3d 177, 161 Ill.Dec. 739, 742, 578 N.E.2d 1385, 1388 (5th Dist.1991) and *Jursich v. Arlington Heights Fed. Sav. & Loan Ass'n,* 110 Ill.App.3d 847, 65 Ill.Dec. 549, 553, 441 N.E.2d 864, 868 (2d Dist.1982)) (internal quotations omitted).

Reading *Nieminski* together with the Ninth Circuit's decision in Lai, we must find that Cremin's consent to arbitrate employment disputes under the U–4 and exchange rules was knowing. First, as we explained above, Cremin is subject to both the NYSE rule and the NASD 1993 amendments mandating arbitration of employment disputes. Both Cremin and the *Nieminski* plaintiff sued based on discrimination that occurred, at least in part, after the October 1993 NASD amendments. And both filed suit in 1996. Consequently, the timing of the "relevant conduct" in each case removes the concerns of applying the NASD amendments retroactively.[11] Second, contract law prevents us from finding that Cremin did not knowingly agree to arbitrate her Title VII

claims. Cremin is well-educated, with an MBA in finance from Northwestern University, and intelligent, alleged to have "enjoyed an excellent reputation both with regard to the high quality of her work and her conscientious devotion to her job." See Form U–4; Compl. ¶ 2. The arbitration clause in the U–4 she signed was conspicuous and presented in clear language, as was the compliance clause on the same page. Both were proceeded by capital letters urging her to read the provisions "very carefully." Under these circumstances, it is fair to apply the elementary rule of contract law that one is presumed to know the contents of a signed agreement. *See Beauchamp,* 918 F.Supp. at 1097–98. Moreover, as *Nieminski* held, Illinois contract law does not require Cremin to have been aware of the full reach of the agreement at the time she signed it. Under *Lai*'s "knowing" requirement, we ask only whether Cremin knew she was bound by future amendments.

To summarize, we are unable to sustain Cremin's claim that the U–4 arbitration clause violates her statutory rights under the 1991 Civil Rights Act. First, we cannot accept *Lai* and its interpretation of the Civil Rights Act's legislative history as consistent with the Supreme Court's decision in *Gilmer.* Second, Lai is distinguishable from this case because it involved plaintiffs who were not NYSE members, and a lawsuit filed before the NASD Code was amended to include employment disputes. Because Lai's "knowing" analysis was based on *Farrand,* a decision that came down before the NASD Code was amended, that analysis has no force here. Therefore, we dismiss Cremin's statutory claims in Count III.

We realize that this ruling eliminates Cremin's ability to challenge prospectively the securities industry's arbitration procedures. Nevertheless, our decision does not sound the death knell for Cremin's civil rights claims.

▆▆▆▆ For one, the D.C. Circuit in *Cole v. Burns Int'l Security Services* recognized that both the Federal Arbitration Act, 9 U.S.C. § 10(a), and case law provide for meaningful judicial review of public law issues decided

---

11. The case for holding that Cremin knowingly agreed to arbitrate employment disputes is even stronger than in *Nieminski.* The plaintiff in that case was not a member of the NYSE, and, as such, was not subject to the earlier NYSE rule calling for arbitration of employment disputes.

by arbitrators. 1997 U.S.App. 2223, at *67–73. In addition to the grounds laid out in the Arbitration Act, courts may set aside arbitration awards if they are contrary to "some explicit public policy" that is "well defined and dominant" and determined "by reference to the laws and legal precedents." *Id.* at *68. (citations omitted). In fact, arbitration awards have been vacated in the collective bargaining context "when they were inconsistent with public laws like Title VII." *Id.* at *69 n. 19. *Cole* also cited the Supreme Court's statement that courts may vacate arbitration awards that are in "manifest disregard of the law," *see First Options of Chicago v. Kaplan*, 514 U.S. 938, ——, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995), and highlighted the Supreme Court's confidence that judicial review "is sufficient to ensure that arbitrators comply with the requirements of the statute at issue." *Id.* (citing *Gilmer*, 500 U.S. at 32 n. 4, 111 S.Ct. at 1655 n. 4) (internal quotations omitted).

Secondly, as *Cole* observed, arbitration has its own set of benefits in the employment context:

> [F]or all of arbitration's shortcomings, the process, if fairly conducted, is not necessarily inferior to litigation as a mechanism for the resolution of employment disputes. As the Dunlop Commission [Department of Labor Commission headed by former Secretary of Labor John Dunlop] recognized: "Litigation has become a less-than ideal method of resolving employees' public law claims .... [they] must endure long waiting periods as the overburdened court system struggles to find time to properly investigate and hear the complaint. Moreover, the average profile of employee litigants ... indicates that lower-wage workers may not fare as well as higher-wage professionals in the litigation system...."
>
> Arbitration also offers employees a guarantee that there will be a hearing on the merits of their claims; no such guarantee exists in litigation where relatively few employees survive the procedural hurdles necessary to take a case to trial in the federal courts.

*Id.* at *73–74 (quoting COMMISSION ON THE FUTURE OF WORKER–MANAGEMENT RELATIONS, REPORT AND RECOMMENDATIONS 30 (1994)) (alterations added by court).

Finally, our decision preserves the possibility that Cremin might remain in court; dismissing Count III does not have the effect of compelling arbitration. We simply find no basis to issue a declaratory judgment that mandatory arbitration deprives Cremin of constitutional due process and statutory rights. And we express no opinion on the validity of Count IV of the complaint, which seeks to void the U–4 arbitration clause under contract law and equitable theories. In short, our decision does not render the arbitration clause conclusively valid. It simply prevents Cremin from using the Constitution or the 1991 Civil Rights Act to challenge it.

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss Count III of Cremin's complaint is granted. Defendants NYSE and NASD are dismissed from this action because that is the sole count in which they are named. Cremin may choose, if she wishes, to file an appropriate amended complaint consistent with this opinion on or before March 10, 1997. A status hearing will be held on March 11, 1997 at 9:15 a.m. to determine the most efficient way to proceed with a fair resolution of this lawsuit.